BOOTH NEWSPAPERS, INC.
v.
The UNITED STATES.
The EVENING NEWS ASSOCIATION
v.
The UNITED STATES.
Nos. 57–59, 84–60.

United States Court of Claims.
June 6, 1962.

N. Barr Miller, Washington, D. C., for plaintiffs. J. Marvin Haynes, Joseph H. Sheppard, Arthur H. Adams and Haynes & Miller, Washington, D. C., were on the briefs.

Cynthia Holcomb, Washington, D. C., with whom was Asst. Atty. Gen. Louis F. Oberdorfer, for defendant. Edward S. Smith, Lyle M. Turner and Philip R. Miller, Washington, D. C., were on the briefs.

JONES, Chief Judge.

Plaintiffs, Booth Newspapers, Inc. and The Evening News Association, bring these suits to recover alleged overpayments of corporate income taxes, plus deficiency interest, paid for the taxable year 1954. Since both suits involve many of the same material facts and present identical issues, they were consolidated for trial, argument and joint findings of fact. It is asserted in both suits that the Commissioner of Internal Revenue erroneously determined that certain losses sustained by both plaintiffs in 1954 from the sale of the stock of a third corporation were capital losses and hence de-

ductible only to the extent of capital gains for that year.

Both plaintiffs are Michigan corporations and both are engaged in the business of publishing newspapers in that state. Aside from their joint participation in the transaction hereinafter described, however, plaintiffs are not in any way connected.

Being in the business of publishing newspapers, an inventory of newsprint in sufficient quantity is essential to each plaintiff. Prior to 1947, both plaintiffs purchased their entire newsprint requirements from established manufacturers of that commodity under long-term contracts. The contract price for newsprint to each plaintiff was approximately $90 per ton in early 1947 and immediately prior thereto. Except during World War II, when newsprint was rationed by the War Production Board, plaintiffs' contract suppliers were able to furnish them with adequate quantities of the product for their normal operations. Consequently, neither plaintiff had occasion to own or control any manufacturer or supplier of newsprint, or become involved in any way with the manufacture of that product. It was, in fact, the policy of both plaintiffs not to invest in the capital stock of other companies at all.

In 1946 and 1947, an unprecedented demand for newsprint developed in the United States and, when normal sources of supply were unable to cope with it, a severe shortage resulted throughout the publishing industry. Plaintiffs' regular suppliers were unable to fulfill their contractual obligations, and plaintiffs were thus unable to obtain adequate supplies for the needs of their businesses. Moreover, plaintiffs could obtain no assurance from their suppliers that adequate quantities of newsprint would be available to them during the next 2 to 4 years.

As a result of this shortage of newsprint, both Booth and Evening News were compelled to reduce the normal size of their publications by curtailing news content and advertising. Booth found it necessary to discontinue all circulation promotional activities and, in February of 1947, Evening News was forced to the extreme of omitting all display and classified advertising for three successive days. This was particularly onerous to Evening News because competing newspapers, which were members of newspaper chains and thus able to divert newsprint from other areas to the Evening News competitive area, made extensive efforts to capture the advertising business of Evening News.

In order to circumvent the difficulties caused by the newsprint shortage, plaintiffs were compelled to resort to the so-called "spot" or "gray" market which had developed by mid-1947. This was the only available source of additional newsprint in the country, and consisted primarily of newsprint imported from European sources. Therefore, plaintiffs attempted, when possible, to meet their requirements by going into this market for special purchases at exorbitant prices. In 1947 alone, Evening News purchased some 4,618 tons of newsprint in the "spot" market at an average price of $200 per ton, and Booth purchased some 1,514 tons at an average price of $196.29 per ton. Similar purchases were made by Evening News during 1948 and 1949 at an average price of $175 per ton, while Booth was compelled to pay an average of $175 per ton for the purchases it made during 1948.

As both plaintiffs were simultaneously experiencing an unprecedented shortage of newsprint, they collaborated in extensive efforts to find additional newsprint to meet their needs. In March of 1947, they joined in engaging the services of a firm of consulting engineers to investigate possible sources of newsprint. This firm was a consultant to the Canadian pulp and paper industry and was familiar with the world newsprint markets. After the consulting engineers had explored the newsprint situation, including the foreign market, without success in locating sufficient additional supplies for plaintiffs, they recommended to plaintiffs the purchase of a small paper mill for the purpose of augmenting their supply of newsprint by manufac-

turing their own. This recommendation was initially rejected by plaintiffs on the grounds that they were adverse to entering the newsprint manufacturing business and preferred to retain their regular sources of supply to the fullest possible extent. Nonetheless, the newsprint shortage subsequently became so acute that plaintiffs reconsidered and decided to investigate the possibility of acquiring a small paper mill which could be suitably converted to the production of newsprint.

It became known to plaintiffs, through the consulting engineers, that the Michigan Paper Company of Plainwell, Michigan (hereinafter referred to as "Michigan"), could be purchased. This company was engaged in the operation of a paper mill for the manufacture and sale of fine quality writing paper and book paper. While it was not then manufacturing newsprint, plaintiffs were advised that a part of its equipment could be converted to the production of newsprint and thus provide a supplemental source of supply during the period of shortage.

No other solution to their problem being apparent and being unsuccessful in attempting to persuade the management of Michigan to manufacture newsprint for them, each plaintiff finally agreed to purchase one-half the available stock of the paper company. During the period from November 17 through December 1, 1947, they each acquired 45,000 shares of the 100,000 shares in Michigan outstanding. Since they deemed it necessary for business reasons to acquire all of the outstanding stock of Michigan, if possible, plaintiffs were required to pay $25 per share to the former stockholders. The remaining 10,000 shares were purchased by plaintiffs, at $25 per share, as they became available subsequently during the period 1948 through 1951. Thus, plaintiffs ultimately acquired all of the stock of Michigan, 50,000 shares each, for a total consideration of $2,500,000, one-half of which was paid by each plaintiff. In addition, each plaintiff incurred substantial expenses relative to the acquisition of this stock. ·

Thereafter, a part of Michigan's production equipment was converted to the manufacture of newsprint and utilized as a supplemental source of that product to offset the short shipments plaintiffs were receiving from their contract suppliers. All of Michigan's production facilities were not so converted, however, because the acquisition of Michigan was an expediency to relieve plaintiffs' shortages of newsprint, and their ownership of the company was intended to continue only until an adequate supply could be assured by their regular suppliers. Consequently, during the period of plaintiffs' ownership, Michigan continued the manufacture and sale of its regular products for the purpose of fulfilling existing contracts and retaining its competitive position in its regular market as much as possible so that plaintiffs could dispose of the company on attractive terms as soon as the newsprint shortage ended.

In this manner, then, plaintiffs were able to mitigate the difficulties caused by the severe national shortage of newsprint. Although the newsprint product turned out by Michigan was not of the quality of that furnished by plaintiffs' regular suppliers, it was, apparently, adequate to meet their needs. Michigan was, however, able to turn out a highly satisfactory rotogravure paper, which was used by Evening News for its Sunday pictorial magazine. In any event, both plaintiffs purchased, at cost, substantial quantities of Michigan newsprint from late 1947 to early 1953, although there was a period of 13 continuous months when Evening News purchased no newsprint from Michigan and a period of 7 continuous months when Booth also found it unnecessary to make any purchases. Both of these periods occurred, principally, during the year 1950.

By mid-1949 and 1950, Michigan commenced efforts to restore its position in the field of fine writing paper and book paper, replacing much of the effort that had been directed to the manufacturing of newsprint. This resulted from the fact that, insofar as plaintiffs were concerned, the newsprint shortage had eased

and appeared to be pretty well over by that time. Nevertheless, plaintiffs still had no assurances from their regular suppliers that the shortage was definitely over then and, as a matter of fact, newsprint procurement did become more difficult with the outbreak of the Korean War. The record shows that plaintiffs considered the Michigan mill to be insurance for them during this period of time against the threatened recurrence of a newsprint shortage.

It was not until 1953 that supply and demand for newsprint in the United States were brought into balance for short periods of time. Even then, however, shortages recurred intermittently as demand increased; and individual publishers, generally, had no assurance of adequate newsprint supplies for the future. This situation continued until 1956, when additional permanent capacity for the production of newsprint finally relieved the threat of shortages.

During 1951, plaintiffs were able to execute new long-term contracts with one of their regular suppliers of newsprint, who was in the process of constructing a new manufacturing plant. The contracts provided for the delivery of 7,800 tons of newsprint per annum to Booth and 4,500 tons per annum to Evening News. However, the plant was not scheduled for completion until January 1, 1954, and deliveries were programmed to commence as shortly thereafter as possible. Commercial production actually started at the new paper mill in June of 1954 and, as a result, plaintiffs were no longer faced with threatened shortages by that time.

Thus having assured themselves of an adequate supply of newsprint commencing in the near future, plaintiffs decided, in July of 1953, to sell their Michigan stock. The same firm of consulting engineers referred to previously were retained for the purpose of locating a purchaser and negotiating a sale. Plaintiffs thereafter received various proposals from other paper companies contemplating mergers or exchanges of stock with Michigan. These offers were rejected, however, because plaintiffs were not interested in carrying on any mill operations and desired to confine their activities to the publication of newspapers.

On February 3, 1954, plaintiffs finally sold the Michigan stock to a Pennsylvania corporation at a price of $13 per share, $12 per share less that what they had paid for the stock. Negotiations for this sale had commenced in the fall of 1953, after plaintiffs had unsuccessfully endeavored to obtain a higher price per share from other prospective purchasers. Booth and Evening News each received $650,000 from the proceeds of this sale, and incurred expenses in 1954 incident to the sale in the amounts of $20,675 and $19,625, respectively.

During the period in which plaintiffs owned Michigan, no dividends were paid by the latter to its stockholders although it had earned substantial net profits. Plaintiffs, being more interested in obtaining newsprint during the time of shortage, directed that the surplus earnings be used to replace Michigan's old equipment and increase the efficiency of the company so that the mill would be more attractive to a potential purchaser when the newsprint shortage was alleviated. Also, some of the surplus earnings were devoted to rebuilding Michigan's regular market, which had been destroyed somewhat when a part of its equipment was converted to the production of newsprint.

In their Federal income tax returns for the taxable year 1954, each plaintiff deducted from gross income the amount of loss suffered ($619,650.80 for Booth and $638,379.34 for Evening News) as a result of the sale of Michigan stock. The Commissioner disallowed these deductions, however, on the ground that the losses sustained were capital in nature and hence deductible only to the extent of capital gains for 1954. The resulting deficiencies, plus interest, were consequently assessed and paid by plaintiffs. Timely claims for refund were filed and, when the Commissioner took no action relative to them, these suits followed.

Plaintiffs say that the losses they sustained in procuring additional newsprint

are fully deductible from gross income when incurred as either business expenses under section 162(a) of the Internal Revenue Code of 1954, 26 U.S.C. (I.R.C. 1954) § 162(a) (1958 Ed.) or as ordinary losses not compensated for by insurance under section 165(a) of the 1954 Code, 26 U.S.C. (I.R.C.1954) § 165(a) (1958 Ed.).

Defendant, on the other hand, argues that this case presents a classic example of a capital transaction, wherein plaintiffs purchased the entire capital stock of a going-concern organization and thus acquired a manufacturing subsidiary which they held for some 6 years before selling out at a loss. Even going behind the purchase of capital stock *per se*, continues defendant, the facts clearly demonstrate that plaintiffs purchased, in effect, nothing more than plant and equipment, as distinguished from inventory; items which traditionally have been considered capital in nature and which must, therefore, be accorded capital asset treatment.

■ The crucial issue, then, is one of determining whether the stock of Michigan, in the circumstances disclosed above, constituted a capital asset in the hands of these plaintiffs. Our initial point of inquiry is section 1221 of the 1954 Code,[1] 26 U.S.C. (I.R.C.1954) § 1221 (1958 Ed.), the section which purports to define what is meant by the term "capital asset." That section speaks in terms of "property" held by the taxpayer. It specifically excludes from the concept of "capital asset," *inter alia*, such items of property as stock in trade, actual inventory, property held for sale to customers, and depreciable and real property used in the taxpayer's trade or business. As a general proposition, of course, capital stock does constitute "property" and, aside

from stock sold by dealers in the usual course of their business, does not fall within any of the express exclusions of section 1221. On the face of it, then, it would seem that the Michigan stock here involved is encompassed by the literal language of that section.

But the term "property" as used in section 1221 is an elastic concept and not all-inclusive. The Supreme Court has indicated as much in the well-known case of Corn Products Refining Co. v. Commissioner, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955). The Court there held, where corn was an essential raw material in the taxpayer's business and the taxpayer had entered into a program of buying and selling corn futures to protect itself against a rise in the price of corn, that the taxpayer's transactions in the futures were an integral part of its business, designed to protect its manufacturing operations, and that any gain or loss realized by the taxpayer from these transactions would be ordinary, not capital, in nature.

This flexible approach to the concept of "capital asset" has been applied and developed in a number of subsequent cases. For example, in Electrical Fittings Corp., 33 T.C. 1026 (1960), the taxpayer had participated with two other companies in the formation of a corporation which was to manufacture ductile iron, an essential raw material in the taxpayer's manufacturing operations which it had difficulty in obtaining from regular sources. The taxpayer acquired one-third the preferred and one-fourth the common stock in the newly-formed corporation. Subsequently, a more desirable raw material became available to the taxpayer and it sold its stock in the ductile iron company at a loss. The Tax

1. Section 1221 provides in pertinent part:
"§ 1221. Capital asset defined
"For purposes of this subtitle, the term 'capital asset' means property held by the taxpayer (whether or not connected with his trade or business), but does not include—
"(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of

the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;
"(2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business; * * *."

Court held that the loss was not capital in nature but was fully deductible as an ordinary loss, citing Commissioner v. Bagley & Sewall Co., 221 F.2d 944 (2d Cir. 1955); Tulane Hardwood Lumber Co., 24 T.C. 1146 (1955); and Smith & Welton, Inc. v. United States, 164 F.Supp. 605 (E.D.Va.1958). The court stated, at page 1031:

> "The tax treatment of a loss on the sale of * * * stock depends on the purpose for which the petitioner acquired the stock. Stock purchased as an investment is a capital asset; when sold, it creates a capital gain or loss. But stock purchased in the ordinary course of business where the only purpose is to insure a vital source of inventory is not a capital asset, and the loss upon its sale is deductible from ordinary income."

Similarly, in Journal Co. v. United States, 195 F.Supp. 434 (E.D.Wis.1961), the taxpayer, a newspaper publisher, purchased 200 of the 500 shares outstanding in a paper mill for the purpose of obtaining a newsprint inventory for its operations during a period of shortage. It resold the stock at a loss when the shortage was relieved. It was held that, as the taxpayer had purchased the stock for the purpose of obtaining newsprint for use in the normal conduct of its business and had no intention of making a capital investment, it was entitled to deduct the loss as an ordinary business expense.

To the same effect is Mansfield Journal Co. v. Commissioner, 274 F.2d 284 (6th Cir. 1960), wherein the taxpayer, another newspaper publisher, had entered into a long-term contract, for the delivery of newsprint in order to protect itself against shortages and erratic prices and later sold the contract, was held to have realized ordinary income and not capital gain with respect to the proceeds of the sale.[2]

■ The cases we have cited and discussed above set forth the applicable law governing the case at bar. They stand for the proposition that, if securities are purchased by a taxpayer as an integral and necessary act in the conduct of his business, and continue to be so held until the time of their sale, any loss incurred as a result thereof may be fully deducted from gross income as a business expense or ordinary loss. If, on the other hand, an investment purpose be found to have motivated the purchase or holding of the securities, any loss realized upon their ultimate disposition must be treated in accord with the capital asset provisions of the Code.

Thus, the circumstances of the transaction (its factual background, the necessities of the particular business involved at the particular time involved, and the intentions of the taxpayer, both at the time the securities were originally purchased and at the time they were disposed of) are of crucial importance in the resolution of these cases. The fact that securities are "property," in the broad sense of that term, is not conclusive.

■ The record before us amply demonstrates, we think, the business motivation of these plaintiffs at the time they undertook to acquire the Michigan stock. Given the conditions prevalent in the newsprint market at the time and the difficulties plaintiffs experienced with respect to the conduct of their normal business operations, the acquisition of Michigan was an eminently reasonable expedient for them to follow. The difficulty with defendant's position is simply that the record will not support a conclusion that plaintiffs were investment-minded when they purchased the stock. Similarly, the acquisition was more than a mere purchase of plant and equipment. Plaintiffs needed additional newsprint at the time

2. The Tax Court has recently had occasion to consider the business purpose—investment purpose dichotomy we are exploring in Missisquoi Corp., 37 T.C. No. 75 (decided January 17, 1962). There the court found that the original business purpose motivation in the purchase of debentures had changed to an investment purpose motivation before they were resold. The resulting loss was therefore held to be capital in nature.

and their investigations indicated that the purchase of a paper mill was the only feasible solution to their problem. As it was, plaintiffs were able to obtain needed newsprint from Michigan during the same month they began purchasing its stock. Thus, rather than characterizing the transaction as a mere purchase of plant and equipment, it seems more accurate to characterize it as the acquisition of a vital source of inventory. In view of these circumstances, we conclude that plaintiffs were motivated to acquire Michigan solely as a temporary expedient to insure an adequate inventory of newsprint during the period of shortage. They did not intend their acquisition of Michigan to be an investment, nor did they intend to engage in the business of manufacturing fine quality writing paper and book paper, except insofar as Michigan's continued activities in that regard were a reasonable part of the temporary means of acquiring additional newsprint.

Moreover, we believe the record shows that plaintiffs' original business purpose motivation did not change prior to the time they disposed of the stock. Although there was a time around mid-1949–1950 when it appeared that the shortage was over as far as plaintiffs were concerned, they still had no assurances from their regular suppliers that this was the fact and, as we have indicated, shortages and the threat of shortages still persisted nationally. It was not until June of 1954, when plaintiffs began receiving shipments under their new long-term contracts, that the shortage ended definitely as to them. They had, by this time, long since disposed of their interest in Michigan. Thus, plaintiffs' intention to insure an adequate inventory of newsprint from Michigan during the period of shortage and threatened shortage was fully supported by practical considerations. Moreover, their activities in locating a suitable offer for the Michigan stock and negotiating the sale covered a period of some 7 months after the decision to sell was made. Consequently, the case at bar is distinguishable from such cases as Gulftex Drug Co., 29 T.C. 118,

affirmed, 261 F.2d 238 (5th Cir. 1958) and Missisquoi Corp., supra, wherein it was found that the original business purpose of the taxpayer had changed to an investment purpose prior to the disposition of the securities there involved.

In view of the foregoing, and in the light of the decided cases and the facts of record, we hold that the Michigan stock was not a capital asset in the hands of these plaintiffs. Therefore, plaintiffs are entitled to deduct the losses they sustained from the sale of this stock from their respective gross incomes for 1954 as either business expenses or ordinary losses.

Judgment will be entered for the plaintiffs with the amounts of recovery to be determined pursuant to Rule 38(c), 28 U.S.C.

It is so ordered.

WHITAKER, LARAMORE, DURFEE and DAVIS, Judges, concur.