Laramore, Judge,
delivered the opinion of the court:
These claims[1] put in issue the character of income resulting from the forfeiture of deposits on returnable steel drums used for the shipment of industrial chemicals. Plaintiffs assert the income is capital gain from the sale, exchange, or involuntary conversion of 'business assets under section 1231, of the Internal Revenue Code of 1954 under this court’s holding in E. I. duPont de Nemours & Co. v. United States, 153 Ct. Cl. 274, 288 F. 2d 904 (1961). The defendant contends these actions do not fall within the compass of the duPont holding because of factual distinctions, and that the governing authority is Corn Products Co. v. Commissioner, 350 U.S. 46 (1955), which would deny favorable “1231” treatment. Alternatively, defendant argues plaintiffs have failed to show the sale, exchange, or involuntary conversion *193 required for capital gain treatment. We think that the facts in the present actions present the same legal issue as those in duPont, and that the reasoning of that opinion applies with equal force here. In the present opinion, we do no more than readopt the reasoning of that case.
The facts have been stipulated. During the tax years before us, the Philadelphia Quartz Company (plaintiff in Case No. 40N64) shipped chemical products in returnable steel drums to those customers who required less than tank car or tank truck lots. These drums, which were roughly three feet long and two feet in diameter, were manufactured of 14-gauge steel by the Jones & Laughlin Steel Corporation; they had a 55-gallon capacity and weighed from 550 to 745 pounds when filled. Each drum bore the following legend in raised letters on its head or on an attached brass tag: “Philadelphia Quartz Co. owns this drum. It is never sold.” Consistent with this, the invoices relating to the shipment of chemicals in the drum showed a separate hilling item: “returnable drums — deposit of $15.00 each,” and had the same statement that was embossed on the drum or the attached brass tag with the additional information: “Conditions and certification on back hereof are part of this invoice.” The back of the invoice contained the following information:
RETURNABLE DRUM TERMS
These conditions are part of each invoice bearing a returnable drum charge.
The drums for which a deposit charge is made remain the property of Philadelphia Quartz Company. The deposit charge is subject to refund as outlined by conditions below.
I. Identification—
A. Drum head embossed and/or brass tag attached— “Philadelphia Quartz Co. owns this drum. It is never sold.”
* ❖ >Jc # sK
II. Charge—
A. $15.00 each [$10.00 in some instances], payable “net cash in 30 days from date of invoice.”
*194 C. Payment of deposit dobs not cancel conditions below.
III. Credit—
•{•
B. Following receipt of drum in good condition within one year from date of shipment.
*****
D. Refund checks are issued monthly.
The other document attending each transaction was the sales agreement which provided:
Returnable drums shall remain the property of Seller [plaintiff]. At the time of each shipment Buyer agrees to pay Seller’s deposit charge then hi effect and to return the drums to Seller promptly as emptied with freight prepaid by Buyer. Seller agrees to credit Buyer with the amount of such deposit charge on drums returned within one year if received in good condition at Seller’s plant from which shipped.
The primary purpose of this arrangement was to secure return of the drums. This may be inferred from a number of factors. First, the amounts of the required deposits were significantly higher than the costs of the drums. The drums for which a $10 deposit was required cost $6.77 on average; those requiring a $15 deposit cost $7.51 on average. Although the stipulation does not so state, it seems apparent that chemical buyers wanting drums could buy them for less, though perhaps not at the same (presumably) low bulk rate paid by Philadelphia Quartz Company to Jones & Laughlin. This proposition assumes greater force when the depreciable character of the drums is considered. These drums were constantly reused and had an average life of 6% years for tax purposes. Assuming the depreciable life of the drums was related to reality, it is evident that older drums were worth less than newer, making the “cost-deposit” differential even greater on older drums. In short, a drum “purchased” by forfeiture of the deposit was no bargain. Second, the value of the drums was substantial in relation to the value of the chemicals shipped in them. Philadelphia Quartz Company shipped three grades of material in these drums, the low priced averaging $10.70 per drum, medium priced $18.31 per drum, and high priced $41.53 per drum, respectively. *195 Third, it has been stipulated that the returnable drum system, to the extent it succeeded, enabled the company to avoid the administrative burden of continually purchasing, stocking and accounting for drums. Fourth, the stipulation shows that most customers returned the drums and that the company gave credits even for late returns.
For the taxable year 1957, the Philadelphia Quartz Company included in its taxable income one-fourth of the amount carried on its books as of December 31,1964, as the liability for unreturned deposits. (The other three-fourths had been previously included in income in the preceding three years.) From 1968 through 1960, a different system was used; the annual excess of drums shipped over drums returned was averaged for the prior seven years, and the resulting average for one year was multiplied by the $15 deposit amount to produce an income figure. There is apparently no question that this method of estimating the current year’s income from forfeited deposits was permissible in this case. The amounts claimed as overpayments for 1957 through 1960 are in each instance the difference between the 52 percent tax paid on the income and the 25 percent capital gains rate.
The facts stipulated by Philadelphia Quartz Company of California (plaintiff in Case No. 421-64) and the defendant are almost identical. The invoices, although different, were equally clear in specifying that the drums were the property of the company and returnable. Also different was the cost of the drums, but although higher, it was less than the deposit price. The other differences are of still less significance. The claims for refund relate to the taxable years 1958 through 1960. The method of computing the income for. 1958 was identical to that used by the other plaintiff for its taxable year 1957. For 1959, the earlier described averaging method was used to compute the income from the forfeited deposits, and for 1960, since the seven year average showed an excess of returns over shipments, the income was computed by reducing the deposit liability to inactive accounts.
The duPont case also involved returnable containers for industrial chemicals and a similar deposit system. The sales documents there, like those here, specified that the seller *196 owned the containers and that the deposit would be returned upon receipt of the container. The deposit amount was significantly above cost, and the practice was to refund deposits even when containers were received after the expiration of the specified time. 153 Ct. Cl., at 278,288 F. 2d, at 906. This is also the case here. The issue was whether the income from the forefeitures qualified for capital gain treatment under section 117(j) of the Internal Revenue Code of 1939. The defendant admitted that four of the provision’s six requirements had been satisfied. Thus, it was beyond dispute that duPont’’s cylinders (1) were used in the trade or business, (2) were subject to an allowance for depreciation, (3) were held for more than six months, and (4) were not included in inventory if on hand at the close of the taxable year. The dispute was over the provision’s other requirements — i.e., (5) that the cylinders not be held by the taxpayer primarily for sale to customers in the ordinary course of its trade or business and (6) that the disposition of the cylinders be by sale, exchange, or involuntary conversion. 153 Ct. CL, at 280-281,288 F. 2d, at 908.
In the present actions, section 1231 of the 1954 Code is applicable; it is the successor to section 117 (j) and is substantially identical. The defendant here does not contend that the drums were held primarily for sale to customers as it did in duPont. This court put that issue to rest in duPont, 153 Ct. Cl., at 281, 288 F. 2d, at 908; any remaining doubts must have been resolved by Malat v. Riddell, 383 U.S. 569 (1966). The defendant urges instead that duPont may be distinguished as involving more substantial equipment, and that d/dPont should be re-examined in the light of recent developments in the so-called Corn Products rule. We have already indicated that we do not see significant factual distinctions between the present case and duPont. Nor do we think alleged recent developments in the Corn Products rule change what this court said about that rule in duPont.
In duPont, the court observed that the cases before and after Gorn Products all dealt with so-called section 1221 assets. 153 Ct. CL, at 283, 288 F. 2d, at 909. The sole authority for extending the rule to section 1231 assets was the *197 Commissioner’s own revenue ruling. Rev. Rul. 58-77, 1958-1 Cum. Bull. 118. The only recent authority cited by defendant for its theory is United States v. Hess, 341 F. 2d 444 (10th Cir. 1965), in which the Tenth Circuit, in reviewing a trial court’s jury charge, assumed that Corn Products could apply to 1231 assets. Id., at 447. The other cases cited simply do not prove defendant’s point. Malat v. Riddell, supra, at 572; Recordak Corp. v. United States, 163 Ct. Cl. 294, 298, 325 F. 2d 460, 462 (1963); Booth Newspapers Inc. v. United States, 157 Ct. Cl. 886, 894, 303 F. 2d 916, 920 (1962). This is a potentially troublesome area which need not be disturbed now if it is determined that the Corn Products theory does not apply to the facts of these actions. We do not think it does, so we expressly reserve decision on the applicability of the Corn Products rule to section 1231 assets.
To us, the essence of the Oom Products decision is that transactions integral to or at the core of a business will occasion ordinary income treatment because of Congress’ intent “that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss.” 350 U.S., at 52. There, the Court held that profits from the sale of com futures were ordinary income and outside section 1221 because the taxpayer regularly traded futures to assure a supply of com at competitive prices for its processing business. The present facts are quite dissimilar. In no sense is the income from forfeited deposits integral to or at the core of plaintiffs’ chemical businesses in the fashion that the Com Products Company’s futures trading was intimately connected to its entire raw material supply operations. Surely taxpayers can be in multiple trades or businesses, and plaintiffs could be in the drum sales business as well as the chemicals business. But that is not the case. The defendant has not contended that plaintiffs held the tanks primarily for sale to customers under section 1231(b) (1) (B); this would seem to be a prerequisite for being in the drum business.
It is true that there is language in Corn Products which has an apparently broad sweep: “The preferential treat *198 ment provided by § 117 [the predecessor to both sections 1221 'and 1231 of the 1954 Code] applies to transactions in property which are not the normal source of 'business income,” Id., at 52. And there is no doubt that in the present case, the income was regular and statistically foreseeable. We are of the view, however, that mere recurrence of income is not the test. Contra, 75 Harv. L. Bev. 845, 847 (1962). In this connection, the practices of the leasing industry are instructive. Car rental companies regularly dispose of their equipment after a relatively short period of use. Before the useful life and salvage value issues relating to depreciation were settled in the cases cited below, it was very common for car rental companies to have substantial and regular income from car sales. The gains resulted from the industry practice of taking the greatest and fastest depreciation deductions possible. The used cars typically had an adjusted basis below the used car sales price. These cars were section 1231 assets, and it was simply assumed that the income on their sale was taxable at the 25 percent rate. See Massey Motors, Inc. v. United States, 364 U.S. 92, 97 (1960); Hertz Corp. v. United States, 364 U.S. 122 (1960).
In the alternative, defendant argues there was no sale, exchange, or involuntary conversion necessary for section 1(231 treatment. The gist of this argument is that all the documents and the drums themselves stated the drums were not for sale. In addition, “sales” law would not recognize plaintiffs’ accounting acts as sales. A similar argument was made by the government in duPont, 153 Ct. Cl., at 281-282, 288 F. 2d, at 908-909, there based on Nehi Beverage Co., 16 T.C. 1114 (1951). In that case, the Tax Court held there was no sale, exchange, or involuntary conversion of unre-tumed pop bottles because they were presumably destroyed and in no sense transferred or converted. This court distinguished duPont’s steel cylinders from pop bottles, noting that at the time duPont credited its income accounts with the forfeited deposits, the cylinders were undoubtedly still in existence and being used. The present case presents no new aspect. We reaffirm this part of duPont with two more *199 precise observations. First, we note that one requirement of a sale or exchange was met in the transfer of the drums for a valuable consideration — albeit on a forfeitable deposit or conditional basis. Second, it would seem possible for the cancellation of the liability to the depositor,' after expiration of the time for forfeiture, to constitute a sale or exchange. See 75 Harv. L. Rev. 845, 846 (1962), and cases cited thereat.
In conclusion, we hold that the income from these forfeited deposits is entitled to capital gain treatment under section 1231, and that plaintiffs are, accordingly, entitled to recover. The amounts of recovery will be determined pursuant to rule 47 (c) ■ (2) of the Rules of this court.
FINDINGS OF FACT
The court, having considered the facts as stipulated by the parties, and the briefs and argument of counsel, makes findings of fact as follows:
A. With respect to the Philadelphia Quartz Company, plaintiff in Case No. 40A-64:
1. Plaintiff, Philadelphia Quartz Company, is, and at all times hereafter mentioned has been, a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business at 1156 Public Ledger Building, Philadelphia, Pennsylvania. It is engaged principally in the manufacture and sale of industrial soluble silicates.
2. Plaintiff sued to recover from the United States the sum of $11,889.65, together with interest as provided by law. This sum is made up of amounts paid as Federal income taxes in the amounts of $5,290.65, $1,776.00, $2,803.00, and $2,020.00 for the calendar years 1957,1958,1959 and 1960, respectively. The action arose under the Internal Revenue laws of the United States and was brought pursuant to section 1491 of Title 28 of the United States Code and sections 6402 and 7422 of the Internal Revenue Code of 1954 (Title 26, U.S.C.).
3. Plaintiff filed its Federal income tax returns (Form 1120) for the calendar years in question on certain dates, disclosing tax liability in certain amounts which, with adjust *200 ments, were paid to the District Director of Internal Revenue at Philadelphia, Pennsylvania, all as set forth below:

For 1957, the tax liability of $707,766.58 includes tax liability of $700,033.60 reflected on the tax return as filed, plus a deficiency in the amount of $7,732.98; for 1958, the tax liability of $287,278.17 is the liability of $288,960.00 reflected on the return as filed, less a refund of $362.00, and less an overassessment in the amount of $1,279.00, and interest thereon of $40.83; for 1959, the tax liability of $719,343.83 includes the liability of $718,783.00 reflected on the tax return as filed, plus a deficiency in the amount of $251.00, and interest of $309.83, which was satisfied by crediting $560.83 of the $1,319.83 credit from the year 1958; for 1960, the tax liability of $478,321.85 includes the liability of $476,736.00 reflected on the return as filed, plus a deficiency in the amount of $1,520.00, and interest of $65.85, which was satisfied by crediting $759.00 remaining of the $1,319.83 credit from the year 1958 and by payment of $826.85.
4. The statute of limitations for assessing additional taxes for the calendar years 1957,1958,1959 and 1960 has not been extended.
*201 5. On July 7, 1961, plaintiff filed with the District Director of Internal Revenue at Philadelphia, Pennsylvania, a timely claim for the refund of Federal income taxes (Form 843) for calendar year 1957 in the amount of $5,290.65, and on July 31,1961, plaintiff filed with the District Director of Internal Revenue at Philadelphia, Pennsylvania, a timely claim for refund of Federal income taxes (Form 843) for each of the calendar years 1958, 1959 and 1960, in the amounts of $1,776.00, $2,803.00 and $2,020.00, respectively, for a total for the four years of $11,889.65, or such greater amount as is legally refundable, plus interest as provided by law. Each claim alleged an overpayment of income tax resulting from the inclusion in plaintiff’s income tax return for the year in question of forfeited deposits on returnable steel drums as ordinary income rather than as long-term capital gains.
6. Each of plaintiff’s claims for refund was rejected in its entirety by certified letters from the District Director of Internal Revenue, dated December 13,1962.
7. During the calendar years 1947 through 1960, as well as in prior and subsequent calendar years:
(a) Plaintiff used certain returnable steel drums to deliver to its customers the chemical products that plaintiff manufactured and sold. The returnable steel drums were purchased by plaintiff from the manufacturer, Jones & Laughlin Steel Corporation, are designed to hold 55 gallons of material, weigh between 550 and 745 pounds when filled, and are sturdily built of 14 gauge steel. The drums are constructed with two pressed out rolling hoops, and have an outside diameter of 23% inches and are 35% inches high. For tax purposes the drums are deemed to have an average life of 6% years. Each drum either had embossed on its head, or carried a brass tag attached, stating:
Philadelphia Quartz Co. owns this drum. It is never sold.
This type of drum was the only one used by plaintiff during the years in question.
*202 (b) Plaintiff’s invoices covering the products sold in the aforementioned returnable steel drums contain the following provisions relative to the subject drums:
(i) on the face of the invoice:
(a) a separate billing item: “returnable drums — deposit of $15.00 each”
(b) at the bottom of the invoice, the statement: “Returnable drums for which a deposit charge is made remain the property of Philadelphia Quartz Co. They are never sold. Conditions and certification on bach hereof are part of this invoice.”
and, (ii) on the back of the invoice, the following statement:
RETURNABLE DRUM TERMS
These conditions are part of each invoice bearing a returnable drum charge.
The drums for which a deposit charge is made remain the property of Philadelphia Quartz Company. The deposit charge is subject to refund as outlined by conditions below.
I. IDENTIFICATION—
A. Drum head embossed and/or brass tag attached— “Philadelphia Quartz Co. owns this drum. It is never sold.”
B. Capacity 55 gallons — made through out of 14 gauge black steel.
II. Charge—
A. $15.00 each, payable “net cash in 30 days from date of invoice.”
B. Deductions from this charge are short payments.
C. Payment of deposit does not cancel conditions below.
III. Credit—
A. Available only to account originally charged.
B. Following receipt of drum in good condition within one year from date of shipment.
C. At works from which shipped — as shown on B/L shipping paper, invoice, and stencilled on drum head (Gardenville, or Buffalo, drums to. be shipped to Ebenezer, N.Y. for PRR delivery — otherwise extra charges accrue).
D. Refund checks are issued monthly.
*203 IV. INSTRUCTIONS—
A. Empty and return drum promptly.
B. Prepay transportation charges.
C. Describe empty drums on B/L — “Returned old (used) steel shipping drums, liquid capacity exceed 15 gallons, with sides made wholly of 16 gauge or thicker sheet.”
D. Mail B/L or trucking receipt to Philadelphia office.
E. Mail invoice or shipping notice to Philadelphia office.
F. Be sure both plugs are tight.
Gr. Lower freight charges mil apply between certain points if B/L is certified by shipper that — “This is to certify that the filled containers which are being returned empty, were received by railroad freight service or by joint railroad freight service in connection with water service.”
The Drums for Which No Charge Is Made Are Not Returnable
All of the invoices used by plaintiff for all sales during the years in question contained the aforesaid provisions.
(c) Plaintiff’s standard form agreements covering the products sold in the aforementioned returnable steel drums contain the following provision:
Returnable drums shall remain the property of Seller [plaintiff]. At the time of each shipment Buyer agrees to pay Seller’s deposit charge then in effect and to return the drums to Seller promptly as emptied with freight prepaid by Buyer. Seller agrees to credit Buyer with the amount of such deposit charge on drums returned within one year if received in good condition at Seller’s plant from which shipped.
In all instances when plaintiff entered into a standard form agreement with a customer during the years in question, such agreement contained the aforesaid provision, and plaintiff entered into no other type of agreement with its customers with respect to the sale of products in returnable steel drums.
(d) Pursuant to the documents described above, and in order to secure the return of the drums, customers were required to make a deposit of $10 or $15, depending upon the *204 particular year, on each drum; which deposit was returned to the customer upon the return of the drums. Plaintiff’s practice was that if the customer returned the drum(s) in good condition within the period stipulated in the governing document, plaintiff returned to the customer his deposit. In practice, even when a drum was returned in good condition to plaintiff after the period stipulated in the governing-document, plaintiff would return the deposit.
(e) The deposits required by plaintiff from its customers were, in each case, in excess of the cost of the returnable drums. The drums for which a $10 deposit was required had an average cost of $6.77; those for which a $15 deposit was required had an average cost of $7.51. To the extent the drums were returned, plaintiff avoided having to replane them with other returnable steel drums and also avoided the administrative burden involved in purchasing, stocking and accounting for such drums.
(f) The material which plaintiff ships to its customers in the returnable steel drums varies substantially in price. The average price of the plaintiff’s low priced material shipped in such drums during the period in question was $10.70 per drum. The average price of the medium and high priced material during this period was $18.31 and $41.53 per drum, respectively. In each instance plaintiff’s investment in the returnable steel drums was substantial in relation to the price which it charged its customers for the contents of the returnable drums.
(g) Plaintiff treated all returnable steel drums here in question as delivery equipment. The use of drums was the most practical way of delivering liquid silicates to plaintiff’s customers when the amount to be shipped was less than a tank car or a tank truck load or when it was most convenient for the customer because of lack of storage space or for other reasons to receive the shipment in returnable steel drums. Plaintiff treated the returnable steel drums, whether in its own hands or temporarily in the hands of its customers, as depreciable assets for Federal income tax purposes, and the *205 Internal Revenue Service, on audit of the plaintiff’s income tax returns, bas consistently allowed plaintiff a deduction for depreciation based upon a useful life of 6% years.
(h) Wlien plaintiff billed its customers for the chemical products sold in the aforesaid returnable steel drums, it separately stated the price of the chemical product and the amount of the deposit, and described the deposit as “Returnable Drum Deposit.” In accounting for the subject drums, when plaintiff shipped a returnable steel drum to a customer it charged the customer’s container account with the value of drums shipped and credited the amount of the customer’s deposit to its cash deposit account. When the customer returned a drum, plaintiff either returned to him the amount of the deposit or gave him credit in that amount, and the balance of the deposit account was reduced accordingly.
(i) All of the returnable steel drums here at issue had been held 'by plaintiff for more than six months.
8. (a) For the calendar year 1957, plaintiff included in its gross income $19,595, being the amount of deposits on returnable steel drums forfeited during that year pursuant to the practice previously set up by direction of the Internal Revenue Service. Such amount was determined as follows:
Calendar Year 1957
Prior to 1953 plaintiff had taken capital gains treatment of the excess deposits- under Section 117(j) of the Internal Revenue Code of 1939, but pursuant to an examination of plaintiff’s 1950-51 income tax returns, the Internal Revenue Service required the treatment of these amounts as ordinary income. On December 31, 1954, four years after the last shipment of returnable drums for which a customer was required to make a $10 deposit, there remained on plaintiff’s books the amount of $76,140, which represented unrefunded $10 deposits made by customers on 7,614 unretumed drums. On the basis of the foregoing and subject to the accounting method which was accepted by the Internal Revenue Serv *206 ice, the amount of additional income resulting therefrom in the calendar year 1957 was computed as follows:
Amount of unrefunded $10 drum deposits included in income in 1957 — one-fourth, of $76,140 (one-fourth previously included income in each of the preceding years 1954, 1955 and 1956), before adjustments_$19,035.00
Adjustment for error in recording amount of unrefunded amount in 1955 (4 drums)_ 40.00
19,075.00
Less: Amount of $10 deposits refunded on drums returned in 1957 (14 drums)_ 140.00
18,935.00
Additional amount included in income for drums reported lost or damaged beyond repair in 1957 (44 drums for which $15 deposit had been made)_ 660.00
19, 595.00
Amount claimed as overpayment (27% of $19,595)_ 5,290.65
(b) In 1958, and in the following years 1959 and 1960, plaintiff began crediting income with $15 deposits on the basis of the annual average excess of returnable drums shipped to customers over drums returned by customers during the immediately preceding 7-year period. Pursuant to the requirement of the Internal Bevenue Service, plaintiff included the amounts so credited as ordinary income. On audit the Internal Bevenue Service after examining the Federal income tax returns of the plaintiff for these years has accepted this method of accounting. As a result, plaintiff included as ordinary income in its income tax returns filed for the years 1958, 1959 and 1960, the amounts of $6,580, $10,880 and $7,480 respectively, which amounts were computed as set forth below:
Calendar Year 1958
On December 31, 1958, the number of returnable steel drums shipped and the number returned for the period 1951 through 1957 were:

*207

Based upon the above, the excess of the number of returnable steel drums shipped, over the number returned for such period was in the amount of 2,77é drums, or an average of 396 unreturned steel drums per calendar year for which a $15 deposit had been made. The amount of additional income resulting therefrom in the calendar year 1958 was as follows:
Amount of unrefunded $15 deposits included in income ¡based upon seven year average (396 unretumed drums), before adjustments_$5,940.00
Less: Amount of $10 deposits refunded on drums returned in 1958 (2 drums)_ 20.00
5,920. 00
Additional amount included in income for drums reported lost or damaged beyond repair in 1958 (44 drums for wbicb $15 deposit bad been made)_ 660.00
6, 580.00
Amount claimed as overpayment (27% of $6,580)_ 1, 776. 00
Calendar Year 1959
On December 31, 1959, the number of returnable steel drums shipped and the number returned for the period 1952 through 1958 were:

*208 Based upon the above, the excess of the number of returnable steel drums shipped, over the number returned for such period was in the amount of 5,029 drums, or an average of 718 unreturned steel drums per calendar year for which a $15 deposit had been made. The amount of additional income resulting therefrom in the calendar year 1959 was computed as follows:
Amount of unrefunded $15 deposits included in income based upon seven year average (718 unretumed drums), before adjustments_$10, 770. 00
Less: Amount of deposits, for drums reported lost or damaged beyond repair in 1958, included in income in 1958— 660. 00
10,110.00
Additional amount included in income for drums reported lost or damaged beyond repair in 1959 (18 drums for wbicb $15 deposit bad been made)- 270.00
10,380.00
Amount claimed as overpayment (27% of $10,380)_ 2,803.00
Calendar Year 1960
On December 31, 1960, the number of returnable steel drums shipped and the number returned for the period 1953 through 1959 were:

Based upon the above, the excess of the number of returnable steel drums shipped over the number returned for such period was in the amount of 3,191 drums, or an average of 456 unreturned steel drums per calendar year for which a $15 deposit had been made. The amount of additional income *209 resulting therefrom in the calendar year 1960 was computed as follows:
Amount of unrefunded $15 deposits included in income based upon seven year average (456 unretumed drums), before adjustments_$6,840.00
Less: Amount of deposits, for drums reported lost or damaged beyond repair in 1951, included in income in 1959_ 270. 00
6, 570. 00
Less: Amount of $10 deposits refunded on drums returned in 1960 (2 drums)_ 20.00
6, 550. 00
Additional amount included in income for drums reported lost or damaged beyond repair in 1960 ( 62 drums for which $15 deposit had been made)_ 930.00
7,480.00
Amount claimed as overpayment (27% of $7,480)_ 2, 020.00
B. With respect to the Philadelphia Quartz; Company of California, plaintiff in Case No. 421-64:
1. Plaintiff, Philadelphia Quartz Company of California, is, and at all times hereafter mentioned has been, a corporation organized and existing under the laws of California with its principal place of business at 901 Grayson Street, Berkeley, California. It is engaged principally in the manufacture and sale of industrial soluble silicates.
2. Plaintiff sued to recover from the United States the sum of $2,619, together with interest as provided by law. This sum is made up of amounts paid as Federal income taxes in the amounts of $1,193.40, $733.05 and $692.55 for the calendar years 1958, 1959 and 1960, respectively. The action arose under the Internal Revenue laws of the United States and was brought pursuant to section 1491 of Title 28 of the United States Code and sections 6402 and 7422 of the Internal Revenue Code of 1954 (Title 26, U.S.C.).
3. Plaintiff filed its Federal income tax returns (Form 1120) for the calendar years in question on certain dates, disclosing tax liability in certain amounts which, with ad *210 justments, were paid to the District Director of Internal Revenue at San Francisco, California, all as set forth below:

For 1958, the tax liability of $458,947.59 is the liability reflected on the return as filed; for 1959, the tax liability of $583,325.90 is the liability reflected on the tax return as filed; and for 1960, the tax liability of $555,711.33 is the liability reflected on the return as filed.
4. The statute of limitations for assessing additional taxes for the calendar years 1968, 1959 and 1960 has not been extended.
5. On March 15,1962, plaintiff filed with the District Director of Internal Revenue at San Francisco, California, a timely claim for refund of Federal income taxes (Form 843) for calendar year 1958 in the amount of $1,193.40, and on August 27,1962, plaintiff filed with the District Director of Internal Revenue at San Francisco, California, a timely claim for refund of Federal income taxes (Form 843) for each of the calendar years 1959 and 1960, in the amounts of $733.05 and $692.55, respectively, for a total for the three years of $2,619, or such greater amount as is legally refundable, plus interest as provided by law. Each claim alleged an overpayment of income tax resulting from the inclusion in plaintiff’s income tax return for the year in question of forfeited deposits on returnable steel drums as ordinary income rather than as long-term capital gains.
6. Notices of the disallowance of plaintiff’s claims for refund for the years 1958 and 1960 were sent by certified mail dated December 27, 1962. No notice of disallowance of plaintiff’s claim for refund for the year 1959 has been received although the claim was disallowed in the report dated October 26,1962, covering both 1959 and 1960.
*211 7. During the calendar years 1947 through 1960, as well as in prior and subsequent calendar years:
(a) Plaintiff used certain returnable steel drums to deliver to its customers the chemical products that plaintiff manufactured and sold. The returnable steel drums were purchased by plaintiff from the manufacturer, Rheem Manufacturing Company, are designed to hold 55 gallons of material, weigh between 550 and 745 pounds when filled, and are sturdily built of 14 gauge steel. The drums are constructed with two pressed out rolling hoops, and have an outside diameter of 24 inches and are 35 inches high. For tax purposes the drums are deemed to have an average life of 10 years. Each of the returnable drums is circle embossed on its bottom with the following identification: “Philadelphia Quartz Co. of Calif.” This type of drum was the only one used by plaintiff during the years in question.
(b) It was plaintiff’s practice to bill as a separate item on its invoices the returnable drum deposits. Plaintiff’s invoices covering the products sold in the aforementioned returnable steel drums also contain the following provisions relative to the subject drums:
Drum Deposit — Net—Full Credit Allowed Upon Return of Deposit Drums in Good Condition to Point of Origin. Freight charges on Returned Deposit Drums Must Be Prepaid. Deposit Drums Remain the Property of Philadelphia Quartz Company of California.
All of the invoices used by plaintiff for all sales during the years in question contained the aforesaid provision. Plaintiffs’ credit memos, covering the products sold in the returnable drums contain a provision identical to the above, and all of the credit memos used by plaintiff for all drums returned during the years in question contained such a provision.
(c) Plaintiff’s standard form agreements covering the products sold in the aforementioned returnable steel drums contain the following provision:
Returnable drums shall remain the property of Seller [plaintiff]. At the time of each shipment Buyer agrees to pay Seller’s deposit charge then in effect and to return the drums to Seller promptly as emptied with freight prepaid by Buyer. Seller agrees to credit Buyer with *212 the amount of such deposit charge on drums returned within one year if received in good condition at Seller’s plant from which shipped.
In all instances when plaintiff entered into a standard form agreement with a customer during the years in question, such agreement contained the aforesaid provision. Plaintiff entered into no other type of agreement with its customers with respect to the sale of products in returnable steel drums.
(d) Pursuant to the documents described above, and in order to secure the return of the drums, customers were required to make a deposit of $10 or $15, depending upon the particular year, on each drum; which deposit was returned to the customer upon the return of the drums. Plaintiff’s practice was that if the customer returned the drum(s) in good condition within the period stipulated in the governing document, plaintiff returned to the customer his deposit. In practice, even when a drum was returned in good condition to plaintiff after the period stipulated in the governing document, plaintiff would refund the deposit.
(e) The deposits required by plaintiff from its customers were, in each case, in excess of the cost of the returnable drums. The drums for which a $10 deposit was required had an average cost of $9.64; those for which a $15 deposit was required had an average cost of $10.87. To the extent the drums were returned, plaintiff avoided having to replace them with other returnable steel drums and also avoided the administrative burden involved in purchasing, stocking and accounting for such drums.
(f) The material which plaintiff ships to its customers in the returnable steel drums varies substantially in price. The average price of the plaintiff’s low priced material shipped in such drums during the period in question was $9.69 per drum. The average price of the medium and high priced material during this period was $18.82 and $31.85 per drum, respectively. In each instance plaintiff’s investment in the returnable steel drums was substantial in relation to the price which it charged its customers for the contents of the returnable drums.
*213 (g) Plaintiff treated all returnable steel drums here in question as delivery equipment. The use of drums was the most practical way of delivering liquid silicates to plaintiff’s customers when the amount to be shipped was less than a tank car or tank truck load or when it was most convenient for the customer because of lack of storage space or for other reasons to receive the shipment in returnable steel drums. Plaintiff treated the returnable steel drums, whether in its own hands or temporarily in the hands of its customers, as depreciable assets for Federal income tax purposes, and the Internal Revenue Service, on audit of the plaintiff’s income tax returns, has consistently allowed plaintiff a deduction for depreciation based upon a useful life of ten years.
(h) When plaintiff billed its customers for the chemical products sold in the aforesaid returnable steel drums, it separately stated the price of the chemical product and the amount of the deposit, and described the deposit as “Returnable Drum Deposit.” In accounting for the subject drums, when plaintiff shipped a returnable steel drum to a customer it charged the customer’s account with the value of the number of drums shipped and credited the amount of the customer’s deposit to its account. When the customer returned a drum, plaintiff gave him credit in that amount, and the balance of the liability account was reduced accordingly.
(i) All of the returnable steel drums here at issue had been held by plaintiff for more than six months.
8. (a) For the calendar year 1958, plaintiff included in its gross income $4,420, being the amount of deposits on returnable steel drums forfeited during that year pursuant to the practice previously set up by direction of the Internal Revenue Service. Such amount was determined as follows:
Calendar Year 1958
Prior to 1956 plaintiff had taken capital gains treatment of the excess deposits under section 117 (j) and section 1231 of the Internal Revenue Code of 1939 and 1954 respectively, but pursuant to an examination of plaintiff’s 1953-55 income tax returns, the Internal Revenue Service required the treatment of these amounts as ordinary income. *214 On December 31,1954, four years after the last shipment of returnable drums for which a customer was required to make a $10 deposit, there remained on plaintiff’s books the amount of $18,400, which represented unrefunded $10 deposits made by customers on 1840 unreturned drums. On the basis of the foregoing and subject to the accounting method which was accepted by the Internal Revenue Service, the amount of additional income resulting therefrom in calendar year 1958 was computed as follows:
Amount of unrefunded $10 drum deposits as of December 31, 1954 (1840 drums)_$18,400.00
Less: Amount of $10 drum deposits refunded on drums returned in 1955,1956, and 1957 (72 drums)_ 720.00
17, 680. 00
Amount of unrefunded $10 drum deposits included in income in 1958 — one-fourth, of $17,680.00- 4,420.00
Amount claimed as overpayment (27% of $4,420.00)_ 1,193.40
(b) In the years 1959 and 1960, plaintiff began crediting income with $15 deposits on the basis of the greater of either: (1) the annual average excess of returnable drums shipped to customers over drums returned by customers during immediately preceding ten year period; or (2) the number of drums in accounts with no activity for the previous five years. Pursuant to the requirement of the Internal Revenue Service, plaintiff included the amounts so credited as ordinary income. On audit the Internal Revenue Service after examining the Federal income tax returns of the plaintiff for these years has accepted this method of accounting. As a result, plaintiff included as ordinary income in its income tax returns filed for the years 1959 and 1960, the amounts of $2,715 and $2,565, respectively, which amounts were computed as set forth below:
Calendar Year 1959
On December 31, 1959, the number of returnable steel drums shipped and the number returned between the period 1950-1959 were:

*215

Based upon the aboye, the excess of the number of the returnable steel drums shipped oyer the number returned for such ten year period was in the amount of 1,293 drums or an average of 129 unretumed steel drums per calendar year, for which deposits in the amount of $1,935 had been made on the basis of $15 per drum. Also, during the previous five year period, 1954 through 1959, unrefunded deposits in the amount of $2,715, representing $15 deposits made on 181 drums, existed in customer accounts in which no commercial activity had occurred for such 5-year period.
The amount of $2,715, the greater of the aforesaid two amounts of unrefunded deposits, was used as a basis for determining the amount of unrefunded deposits included in income for such year, and 27 percent of which amount or $733.05, is the amount claimed as an overpayment for such year.
Calendar Year 1960
On December 31, 1960, the number of returnable steel drums shipped and the number returned between the period 1951-1960 were:

*216 Based upon the above, there did not exist an excess of the number of the returnable steel drums shipped over the number returned for such 10 year period, rather 264 more drums were returned than shipped, or an average of 26 unretumed steel drums per calendar year. During the previous five year period, 1955 through 1960, unrefunded deposits in the amount of $2,565, representing $15 deposits made on 171 drums, existed in customer accounts in which no commercial activity had occurred for such five year period.
The amount of $2,565, was used as a basis for determining the amount of unrefunded deposits included in income for such year, and 27 percent of which amount, or $692.55 is the amount claimed as an overpayment for such year.
CON GLTJSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are entitled to recover, and judgment is entered to that effect. The amounts of recovery will be determined pursuant to Rule 47(c) (2) of the Rules of this court.
In accordance with the opinion of the court, stipulations of the parties, and memorandum reports of the commissioner, it was ordered on June 5,1967, that judgments for the plaintiffs be entered as follows:
No. 404^64_$12, 670. 03
No. 421-64_ 2,619.00
plus interest as provided by law.

 Plaintiff in Case No. 404-64 is the Philadelphia Quartz Company. Plaintiff in Case No. 421-64 is the PhUadelphia Quartz Company of California. The actions have been consolidated.