The CIRCLE K CORPORATION,
Plaintiff,

v.

The UNITED STATES, Defendant.

No. 12–86T.

United States Claims Court.

Filed Aug. 2, 1991.

A. Jerry Busby, Phoenix, Ariz., for plaintiff.

George L. Squires, Washington, D.C., with whom was Asst. Atty. Gen. Shirley D. Peterson, for defendant.

## MODIFIED ORDER

### MOODY R. TIDWELL, III, Judge.

This case is before the court on defendant's motion for partial summary judgment.[1] This court's adjudication of the issues is *de novo*, and not a review of the determination of the Commissioner of Internal Revenue. The original Order in this case, *Circle K Corporation v. United States*, 23 Cl.Ct. 161 (1991), issued May 16, 1991, is vacated in a separate Order issued this date, 23 Cl.Ct. 659, denying defendant's RUSCC 59 motion for reconsideration.

## FACTS

Plaintiff, an Arizona based corporation, operates convenience stores in 12 States. Plaintiff's policy has been to have as many of its stores as possible sell gasoline. In 1980, 726 of plaintiff's 1200 stores had self-service gasoline facilities, and approximately 35% of its total sales were attributable solely to gasoline. Stores that sold gasoline had increased store traffic, and up to 40% higher sales of other merchandise over those stores that did not sell gasoline.

During national oil shortages in 1973–74, and 1979–80, plaintiff experienced difficulty in maintaining sufficient and consistent access to gasoline at competitive prices. At times, plaintiff was unable to procure a supply, at any price, for some of its convenience stores. Because of the close connection between gasoline sales and earnings, plaintiff long had been concerned that any extended interruption in its supply of gasoline could have a material adverse effect on its earnings and operations. In the 1960s and 1970s, plaintiff sought to remedy this problem by pursuing long term supply contracts with major oil companies for refined gasoline, and by trying to acquire refineries, all to no avail. Plaintiff entered the 1980s with 64% of its gasoline needs met through gasoline supply agreements with refiners, with the balance purchased at higher prices on the spot market.

In 1980, NuCorp Energy, Inc. emerged as a possible solution to Plaintiff's gasoline supply concerns. NuCorp was an oil and gas exploration and development company that owned producing oil and gas reserves. On September 15, 1980, plaintiff and NuCorp entered into a common stock purchase agreement, an exploration and development agreement, and a consulting and training agreement. Through the common stock purchase agreement, plaintiff purchased 1,000,000 authorized but unissued shares of NuCorp common stock at $23.50 per share

---

1. The motion for summary judgment addresses only a portion of the tax deductions disallowed by the Commissioner for plaintiff's fiscal year 1983. Other unrelated deductions remain to be adjudicated or compromised.

for an aggregate price of $23,500,000. These 1,000,000 shares represented approximately 12.3% of NuCorp's issued and outstanding stock.

Under the Securities Exchange Act of 1934, plaintiff was required to file a schedule 13D with the Securities Exchange Commission (SEC) because it had acquired over 5% of NuCorp's common stock. In its filing for 1980, plaintiff asserted that it entered into the common stock purchase agreement "solely for the purpose of investment." Plaintiff's schedule 13D submittal also described the exploration and development agreement with NuCorp as one under which "Circle K [would] invest in and acquire a 10% operating interest in all future oil and gas exploration and development activities of NuCorp." Under the consulting and training agreement, NuCorp agreed to provide "certain consulting and training services for Circle K with respect to various aspects of oil and gas exploration, development, financing, production, administration, gathering, processing and trading activities."

On December 15, 1980, plaintiff filed a proxy statement and prospectus (P & P) with the SEC, and scheduled a special meeting of its shareholders for February 3, 1981. The P & P explained that the purpose of the meeting was to vote upon an "agreement and plan of merger and reorganization pursuant to which Circle K will become a wholly owned subsidiary of a holding company named Circle K Holding Company and all of the common stock of Circle K will be exchanged for Holding Company Stock, on a share for share basis." The P & P stated that one of the reasons for the merger was management's belief that a holding company structure would allow greater flexibility in any diversification efforts resulting from its ability to separate any acquisitions from its convenience store operations. Plaintiff identified the oil and gas business as the first area into which it wanted to diversity, and stated that it had entered into the agreements with NuCorp for that reason.

In addition to adding flexibility, plaintiff anticipated that the holding company structure also would provide tax benefits. Plaintiff was aware that under federal income tax laws, specifically, section 613 of the Internal Revenue Code of 1954, producers of oil and gas are allowed to deduct a percentage of the gross oil and gas income from each of their properties. This percentage depletion is not available for gasoline retailers. Plaintiff recognized that in its present corporate form, it qualified as a gasoline retailer because of its convenience store gasoline sales but surmised that, as a holding company, it would be sufficiently removed from Circle K retail gasoline sales to qualify for the beneficial tax consideration. In purported support of this position, the P & P stated that "Circle K presently intends that its oil and gas exploration and development activities will be conducted through a subsidiary whose management and operations will be separate from those of Circle K and that the subsidiary's oil and gas production will not be made available, directly or indirectly, to the Company."

The P & P also explained NuCorp's concern that it could lose its depletion allowance if it sold any of its product to plaintiff. This concern arose because, under the Internal Revenue Code (I.R.C.), an oil producer may not be entitled to the depletion allowance if it sells its product to a gasoline retailer which owns more than 5% of the producer's stock. Bearing this in mind, plaintiff stated that although "its plans are subject to change depending on the availability of gasoline, ... [Circle K] does not expect to purchase, directly or indirectly, any of NuCorp's oil." In February 1981, plaintiff's shareholders approved the reorganization plan.

Section 5 of the exploration and development agreement, "Taking Products in Kind; Marketing of Products," detailed two dispersion methods for plaintiff's 10% interest in NuCorp's oil and gas exploration operation. Section 5.1 stated that plaintiff had the right under the agreement, subject to prior rights of third parties, to receive its share of the oil produced in kind to dispose of independently. If plaintiff decided not to take its share in kind, § 5.2 gave NuCorp the right to market plaintiff's share. Section 5.1 did not prohibit plaintiff

from taking the oil in kind and making it directly or indirectly available to its retail convenience store operations.

In its April 1981 10k Annual Report for the 1981 fiscal year, plaintiff reiterated that all oil and gas operations would be conducted by a subsidiary separate from plaintiff's convenience store operations, and de-emphasized its concern for the depletion allowance. Plaintiff also reiterated its intention not to make available any oil from either its subsidiary operations or from NuCorp, to its retail operations, yet qualified that statement by asserting, as it did in its 1980 P & P, that its plans were subject to change depending on the availability of gasoline.

On November 30, 1981, plaintiff issued a press release describing a substantial modification of its exploration and development agreement with NuCorp that it expected to complete and finalize in late December 1981, or early January 1982. Under the modification, plaintiff agreed to sell back to NuCorp "[all] interests in drill sites, leases and related rights and assets" in exchange for 376,000 newly-issued shares of NuCorp common stock and to "waive its right to participate in NuCorp's exploration and development program prior to January 2, 1983." Additionally, plaintiff agreed to purchase, at a future date, still another 150,000 newly-issued shares of NuCorp stock for an aggregate price of $3,000,000. Finally, and very importantly, plaintiff received an option to purchase crude oil from NuCorp.

Plaintiff could exercise its option twice a year. The option permitted plaintiff to specify from which wells it wanted to purchase the oil and if the wells were not then subject to an agreement with a third party, plaintiff could purchase all the oil from those wells from the exercise date of the option through December 1988. NuCorp could, if necessary, split a well's production between a third party's requirements and available crude for plaintiff. Plaintiff obligated itself to pay NuCorp the "highest economic price" for any oil it acquired. This included payment of the highest market rate at the time, and "any allowances

or benefits granted producers ... which have the effect, direct or indirect, of increasing the economic price of the crude to the purchaser thereof." The option agreement also expressly provided that plaintiff would indemnify NuCorp against any depletion allowance loss that resulted from plaintiff's purchase of NuCorp's oil. The agreement again restated plaintiff's consistent assertion that it did not think NuCorp would lose its depletion allowance because plaintiff anticipated none of NuCorp's product reaching any of plaintiff's retail convenience store operations.

In summary, the agreement with NuCorp originally contemplated a 10% interest in production which later was converted into an option to purchase NuCorp's production of crude oil or natural gas. Plaintiff stated that it entered into these agreements with the intention of diversifying its operations and for investment purposes, but also with the purpose of securing a source of supply of gasoline for its retail operations should the availability of gasoline become so scarce that its usual sources could not meet its needs. Obviously plaintiff could not sell NuCorp's crude oil at its retail convenience stores without refinement into gasoline but, as plaintiff explained, NuCorp's crude oil could be a substitute for a supply of gasoline because of the practice in the energy field of trading product. Through this practice, crude oil produced in one section of the country can be exchanged for refined gasoline at distant and diverse locations. Had the oil crisis worsened, product trading would have become an important part of plaintiff's inventory purchase program. Plaintiff no doubt had a bona fide diversification plan, but that plan was conditioned throughout its various stages with an underlying objective of guaranteeing a source of gasoline for its retail operations during any future oil shortages.

Plaintiff's 13D submission to the SEC dated February 25, 1982, reported the purchase of 376,000 shares of NuCorp stock as outlined in the November 24, 1981 purchase agreement, together with open market purchases of an additional 30,000 shares. In plaintiff's form 10/Q quarterly report filed March 3, 1982, plaintiff disclosed that it

had canceled its proposed purchase of the final 150,000 shares of NuCorp.

For the quarters ending December 31, 1981, and March 31, 1982, NuCorp lost $15,220,000 and $24,908,000 respectively. As a result, the value of it stock plunged to $1.75 per share as of April 30, 1982. At that time, plaintiff owned 2,227,000 shares (after a 3 for 2 split) of NuCorp stock that it had purchased directly from NuCorp, and by intermittent open market purchases. Because plaintiff's average per share purchase price of NuCorp stock was $15.75, the stock plunge represented a sizeable loss. In July of 1982, NuCorp filed for reorganization under Chapter 11 of the Federal Bankruptcy Code. On January 12, 1983, plaintiff's Board of Directors approved the sale of all 2,227,000 shares of its NuCorp stock to a third party for $.10 a share, totaling $227,000.

Plaintiff claimed that it sold its NuCorp stock because it had become clear that Nu-Corp would not be an available solution to its gasoline problem. On its federal Corporate Income Tax Return for its taxable year ending April 30, 1983, plaintiff claimed an ordinary loss deduction in the amount of $27,824,296 attributed to the sale of NuCorp stock. After audit, the Commissioner of Internal Revenue determined that plaintiff's sale of NuCorp stock resulted in a capital loss rather than an ordinary loss. The Commissioner offset plaintiff's capital gains for the taxable years ending April 3, 1980, and April 30, 1982 and 1983 with the NuCorp capital loss. On August 28, 1985, plaintiff filed a claim for a refund of taxes paid for those taxable years, which the Commissioner disallowed. On January 7, 1986, plaintiff filed suit here asking the court to find the sale of NuCorp stock an ordinary loss.

## DISCUSSION

■ Summary disposition requires that no genuine dispute exist as to any material fact, so that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). A "material fact" is a fact that will make some difference in the outcome of a case. *Curtis v. United States*, 144 Ct.Cl. 194, 168 F.Supp. 213, 216 (1958), *cert. denied*, 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959). In considering a motion for summary judgment, the court must view evidence, and draw inferences, in a light most favorable to the non-moving party, and must resolve any doubt against the moving party. *D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d 1144, 1146 (Fed.Cir.1983) *cert. denied*, 474 U.S. 825, 106 S.Ct. 83, 88 L.Ed.2d 68 (1985); *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed. Cir.1985). In its motion for partial summary judgment, defendant contended that there are no genuine issues of material fact and that, as a matter of law the court must treat the sale of Nucorp stock by plaintiff as a disposition of a capital asset. Plaintiff argued that the sale of Nucorp stock qualified as the sale of an ordinary asset under the first listed exception to the definition of capital asset in the Internal Revenue Code, and that the loss on the sale of Nucorp stock should receive ordinary loss tax treatment. The court, from a review of the entire record, finds no disputed issues of material fact. Whether the sale of NuCorp stock was a capital versus an ordinary loss is an issue of law.

This partial summary judgment motion requires an analysis of § 1221 of the I.R.C. which defines capital asset, and more specifically, the application of the first listed exception to that definition. Internal Revenue Code of 1954, ch. 736, 68 Stat. 321 (codified as amended at 26 U.S.C. § 1221 (1988)). Section 1221 defines capital asset as "property held by the taxpayer (whether or not connected with his trade or business)." The first listed exception to that broad definition states that capital asset does not include "stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business[.]" I.R.C. § 1221(1).

■ The difference between ordinary loss and capital loss tax treatment is significant. Under I.R.C. § 1211, corporate capital losses can be offset against only capital gains in the corporation's computation of its income for federal income tax purposes. I.R.C. § 1212 allows for some restricted carryback and carryforward of the capital loss if the corporation lacks sufficient capital gains against which to offset completely the capital loss in the year it is realized. In contrast, the I.R.C. allows the offset of ordinary losses against ordinary income in computing a corporation's tax liability which often results in a substantially larger offset because corporations, as a general rule, have a larger amount of ordinary income than capital gains.

The crux of the issue in this motion is whether sale of the Nucorp stock by plaintiff qualified, as a matter of law, as the disposition of a capital asset or an ordinary asset as defined in §§ 1221 and 1221(1) of the I.R.C. In determining this question, the court must focus on the Supreme Court's interpretation of those sections of the I.R.C. in *Corn Products Refining Co. v. Commissioner,* 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955), and *Arkansas Best Corp. v. Commissioner,* 485 U.S. 212, 108 S.Ct. 971, 99 L.Ed.2d 183 (1988).

The issue in *Corn Products* was whether or not income arising from plaintiff's dealings in corn futures deserved capital gains treatment. Plaintiff's business involved manufacturing products which were made from grain corn such as starch, syrup, sugar, and their byproducts. Droughts in the 1930s caused the price of spot market corn to increase substantially. In response, the company implemented a program to establish a long position in corn futures to protect against possible further price increases. Depending on its manufacturing needs, the company either would take delivery on the corn futures, or sell them. The Supreme Court characterized these transactions as "hedging." In determining whether the company's sales of corn futures fell within a capital asset exception, the Supreme Court stated:

> Admittedly, petitioner's corn futures do not come within the literal language of the exclusions set out in [§ 1221]. They were not stock in trade, actual inventory, property held for sale to customers or depreciable property used in a trade or business. But the capital-asset provision of [§ 1221] must not be so broadly applied as to defeat rather than further the purpose of Congress. *Burnet v. Harmel,* 287 U.S. 103, 108 [53 S.Ct. 74, 76, 77 L.Ed. 199 (1932)]. Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss.... Since this section is an exception from the normal tax requirements of the Internal Revenue Code, the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly.

*Corn Products,* 350 U.S. at 51–52, 76 S.Ct. at 24. The Supreme Court further noted that hedging transactions consistently had been treated as giving rise to ordinary gains and losses and, accordingly, held that the corn futures were subject to tax treatment as an ordinary asset. *Id.* at 52–53, 76 S.Ct. at 24.

In the years following *Corn Products,* lower courts greatly expanded the scope of its holding. Eventually, a "*Corn Products* doctrine" emerged under which assets acquired and sold for regular business purposes were accorded ordinary asset treatment. If the same assets were acquired for an investment purpose, they were treated as capital assets subject to capital asset treatment. Thus, a judicial determination of the motive behind the acquisition of an asset became dispositive of the tax treatment the asset received until the Supreme Court readdressed *Corn Products* in *Arkansas Best Corp. v. Commissioner,* 485 U.S. 212, 108 S.Ct. 971, 99 L.Ed.2d 183 (1988).

Arkansas Best Corporation was a holding company which, in 1968, owned approximately 65% of the stock of the National Bank of Commerce (Bank) in Dallas, Texas. Between 1969 and 1974, plaintiff more than tripled the Bank shares it held. Prior to 1972, the purchases were to accommodate the need of the Bank for increased capital

in order to expand. In 1972, federal examiners classified the Bank as a problem bank because of an unfavorable loan portfolio caused by the decline in the Dallas real estate market. Plaintiff's stock purchases after 1972 were designed to provide capital to help the Bank weather its problems. In 1975, plaintiff reduced its percentage ownership of the Bank to 14.7% by selling, at a loss, most of the shares it possessed, and claimed an ordinary loss on its federal income tax for that sale. The Commissioner of Internal Revenue disallowed the deduction and held that the sale of the Bank stock resulted in a capital loss, and was subject to capital loss treatment per I.R.C. § 1221.

The United States Tax Court held that because plaintiff purchased the pre–1972 shares with an investment motive, they were capital assets necessitating capital loss treatment under *Corn Products*. The shares purchased between 1972 and 1975, however, were ordinary assets that deserved ordinary loss treatment because plaintiff purchased them for the "business purpose" of preserving its reputation by saving the Bank from failure. *Arkansas Best Corp. v. Commissioner*, 83 T.C. 648 (1986). The Court of Appeals for the Eighth Circuit reversed the Tax Court and held that plaintiff's post–1972 Bank stock purchases were capital assets that did not qualify under any of the exceptions to the broad I.R.C. § 1221 definition of capital asset. It further held that plaintiff's motive for acquiring the Bank stock was irrelevant in determining its status under § 1221. *Arkansas Best v. Commissioner*, 800 F.2d 215 (8th Cir.1986).

The Supreme Court affirmed, focusing on the language of § 1221, *i.e.,* "[f]or purposes of this subtitle, the term 'capital asset' means property held by the taxpayer (whether or not connected with his trade or business)." The Court declared that § 1221 has no initial motive test to determine if an item is a capital asset, as this would conflict with the express parenthetical phrase in § 1221 "whether or not connected with his trade or business." *Arkansas Best*, 485 U.S. at 217, 108 S.Ct. at 974. Therefore, the Court repudiated the

practice, which had arisen through judicial application of the *Corn Products* doctrine, of analyzing motive to determine what treatment, ordinary or capital, an asset would receive. The Court found this practice an unwarranted expansion of its *Corn Products* holding.

The Supreme Court then clarified its *Corn Products* holding and the application of the first listed exception to § 1221's definition of capital asset. Section 1221(1) excludes from the definition of capital assets "stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." *Corn Products* revolved around the interpretation of the term "inventory." *Arkansas Best*, 485 U.S. at 220, 108 S.Ct. at 976.

The Court stated that, for the inventory exception to apply, the inventory in question must have a substantially "close connection" with the taxpayer's business. *Id.* at 221, 108 S.Ct. at 976–77. Although the Court disavowed any explicit initial motive inquiry under § 1221, it stated that, in applying some of the exceptions, a limited "business connection" inquiry might be necessary. *Id.* A "close connection" between the corn futures and the products the Corn Products Refining Company produced was crucial to the Court's finding that "the corn futures could be considered surrogates for the stored inventory of raw corn." *Id.* The futures would not have fallen under the inventory exception if the Corn Products Refining Company merely was speculating in futures rather than using them as an integral part of its inventory-purchase system. *Id.* at 222, 108 S.Ct. at 977. The Court held that *Corn Products* properly is "interpreted as standing for the narrow proposition that hedging transactions that are an integral part of a business' inventory-purchase system fall within the inventory exclusion of § 1221." *Id.* The Supreme Court did not hold that the futures contracts actually had to be

exercised in order to qualify as hedging transactions.

Defendant argued that common shares of corporate stock "by their very nature" are capital assets. In the vast majority of situations this is true, but courts following *Corn Products* have recognized the limited situation in which corporate stock was purchased by a company in order to obtain access to the raw materials of a second company. *See Campbell Taggart Inc. v. United States,* 744 F.2d 442, 450 (5th Cir.1984). This type of situation is termed the "source of supply" principle. *Id.* In these situations, courts have found that stock, which later is sold for a loss, may qualify under *Corn Products* for ordinary loss treatment. *Booth Newspapers, Inc. v. United States,* 157 Ct.Cl. 886, 303 F.2d 916 (1962).

While these decisions preceded *Arkansas Best,* nowhere did that opinion specifically reject the "source of supply" principle. Rather, the Court rejected the "business purpose" versus "investment purpose" reasoning underlying the analyses. *See Arkansas Best,* 485 U.S. at 216, 108 S.Ct. at 974. In the absence of any definite indication to the contrary, the court feels that a source of supply analysis, without an intent inquiry, still is valid. Therefore, the court finds that a source of supply stock purchase may qualify as a hedging transaction if it is an integral part of plaintiff's inventory-purchase system.

Defendant here repeatedly and unnecessarily emphasized plaintiff's representations to the SEC about its purchase of the NuCorp stock as a means of diversification, and that plaintiff "disavowed any intent to use its ownership of NuCorp stock to acquire inventory or stock in trade." Defendant maintained that close inspection of plaintiff's December 15, 1980 P & P illuminated its intent, *i.e.,* a plan whereby a reorganization of its corporate form would allow it to invest and expand into oil and gas exploration with NuCorp. The new corporate form, consisting of separate subsidiaries, presumably would have had tax advantages. Plaintiff did what it could to

assure that the advantages would accrue to it by stating on several occasions that it would not make available its oil and gas interests to its retail operations, and thus would be able to take advantage of the depletion allowance permitted oil and gas producers. Yet, as already noted, plaintiff carefully qualified its expressed "intent" for the acquisition of NuCorp stock, and the proposed corporate reorganization, with the statement that "its plans are subject to change depending on the availability of gasoline" and that if the supply of gasoline to its retail operations became a problem, it would make available to it the oil interest it acquired from NuCorp through the trading of products in kind (*i.e.,* oil for refined gasoline), and accept any adverse tax consequences. The court cannot agree that plaintiff "disavowed any intent" to use the NuCorp stock to secure inventory, but stresses that, in any event, *evidence to that effect is entirely irrelevant here.* Plaintiff's statements of its initial intent in purchasing the NuCorp stock may be relevant to an inquiry into whether plaintiff's representations to the SEC were proper, a determination this court need not reach. However, after *Arkansas Best,* this court may not engage in any sort of initial intent inquiry when determining whether or not the stock qualified as a capital or regular asset. Instead, the court must determine whether the stock purchase, solely on its face, had a substantially close connection to plaintiff's business so that it fairly can be characterized as an integral part of plaintiff's inventory-purchase system.

Plaintiff maintained that the option agreement was in the nature of a commodity future as recognized in *Corn Products,* thereby mandating ordinary asset treatment. Defendant countered that the option agreement was not analogous to a commodity future because it lacked a determinable price that would protect plaintiff against price fluctuations, and instead called for plaintiff to pay the "highest economic price" for any crude oil it obtained from NuCorp. The court believes that the "highest economic price" is a determinable price that would protect plaintiff against spot market fluctuations. With a commodi-

ty such as crude oil, access may, as here, be as crucial as locking in a set amount for a specific predeterminable price. Any agreement which provides for access at a reasonable price, and avoids the perils of excess purchases on the spot market, clearly is advantageous. *See Arkansas Best,* 485 U.S. at 220, 108 S.Ct. at 976 (quoting *Corn Products,* 350 U.S. at 50, 76 S.Ct. at 23). Therefore, the alleged lack of a specific set price does not defeat plaintiff's claim that its stock purchases were in the nature of a commodity future.

■ Defendant also argued that plaintiff failed to use its NuCorp interest as part of its inventory-purchase system. That argument is irrelevant. The dispositive inquiry is whether a "close connection" existed between the transaction and the taxpayers business, not whether plaintiff actually exercised its options. *See Arkansas Best,* 485 U.S. at 221, 108 S.Ct. at 976–77. The close connection requirement aids the court in determining whether a particular transaction qualified as a hedging transaction and thus as an integral part of an inventory-purchase system. In the absence of a "close connection" to the taxpayer's business, a transaction cannot be considered an integral part of its inventory-purchase system. *Id.* Plaintiff amply explained, and defendant did not contest, its critical dependence upon gasoline for its corporate earnings health. Plaintiff's experiences during the national oil shortages of 1973–74 and 1979–80 demonstrated that gasoline shortages could lead to decreased corporate earnings.

■ In light of the special place that gasoline held in terms of plaintiff's earnings and profitability, the court feels that plaintiff's investment in NuCorp bore the legally requisite "close connection" with its business to warrant application of the inventory exception. Notwithstanding plaintiff's original, abortive diversification purpose, and its transparent rhetoric designed to avail itself of the depletion allowances, it is clear to the court that, at its base, the agreement with NuCorp guaranteed a supply of gasoline for plaintiff's retail operations should the availability of gasoline become so scarce that purchases on the open market, because of cost or availability, would be insufficient to meet plaintiff's needs. Regardless of much of the language in plaintiff's public utterances regarding its intentions, the end result of the agreement was access to gasoline.

Plaintiff plainly did not use its option agreement to acquire any of NuCorp's crude oil because the time period in which the option agreement was in effect never mandated its use. Plaintiff was able to meet its gasoline needs through its existing contracts with refiners, supplemented by open market purchases. A hedging transaction should not be construed so narrowly as to exclude a valid contract or agreement that gives its holder the flexibility to exercise it or not, depending on market conditions. Plaintiff should not have to forfeit this interpretation simply because the supply of gasoline never reached a point where plaintiff needed to exercise its options. A hedging transaction does not change its character depending on whether or not it is utilized.

On the facts presented here, the court finds, as a matter of law, that Plaintiff's actions constituted valid hedging transactions, and that plaintiff is entitled to have the loss it incurred on the sale of its NuCorp stock treated for tax purposes as an ordinary loss pursuant to I.R.C. § 1221(1).

## CONCLUSION

For the foregoing reasons, the court denies defendant's motion for partial summary judgment. The court, *sua sponte,* will view plaintiff's opposition to defendant's motion for summary judgment as a cross motion for partial summary judgment, and grants that motion in favor of plaintiff.

IT IS SO ORDERED.