**CENEX, INC. (Formerly Known as Farmers Union Central Exchange, Incorporated) and Subsidiaries, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 92–97 T.

United States Court of Federal Claims.

June 27, 1997.

As Modified July 29, 1997.

As Corrected Aug. 26, 1997.

Sue Ann Nelson and Terrance A. Costello, Doherty, Rumble & Butler, P.A., Minneapolis, MN, for plaintiff.

Mary M. Abate, with whom were Loretta C. Argrett, Assistant Attorney General, and Mildred L. Seidman, Chief, Court of Federal Claims Section, Department of Justice, Washington, DC, for defendant.

## *OPINION*

WIESE, Judge.

### Introduction

The plaintiff in this tax refund suit, Cenex, Inc., is an agricultural cooperative corporation engaged in the wholesale distribution, to member cooperatives, of a variety of products and services essential to farmers and ranchers, including refined fuels, agricultural chemicals, farm and home-maintenance equipment, and automotive products. At issue here are questions concerning the proper tax treatment due losses suffered by Cenex on its stock purchases in two unrelated corporations—Energy Cooperative, Inc. (ECI) and Northern Tier Pipeline Company (Northern Tier), each of which was engaged

in a line of business that Cenex saw as an important supplement to its own business needs.

Neither venture proved successful: ECI's business floundered and its stock became worthless; Northern Tier's ambitions to build a petroleum pipeline were abandoned, resulting in unrecovered shutdown costs to Cenex. The resulting losses, claimed by plaintiff in its 1984 corporate income tax return, were disallowed in part by the Internal Revenue Service ["IRS"], thus precipitating this suit for tax refund.

Of the several tax matters in issue, two are presented for decision now on cross-motions for summary judgment.[1] We address, first, whether the loss associated with Cenex's investment in ECI qualifies as an ordinary loss, as plaintiff contends, or must instead be treated as a capital loss, as defendant insists; second, whether payments made by Cenex to Northern Tier for shutdown costs qualify as ordinary losses (bad debts), as plaintiff argues, or are properly characterized as contributions to capital, thereby requiring capital loss treatment, as defendant contends. Both issues have been fully briefed and argument in respect to them was heard by the court on June 10, 1997. We decide both issues in defendant's favor.

### The ECI Stock Loss

#### *The Factual Background*

In 1975, plaintiff, together with eight other regional cooperatives, established CF Petroleum Company, later renamed Energy Cooperative, Inc., a corporation formed to operate an oil refinery at East Chicago, Indiana, that the organizing cooperatives had jointly agreed to purchase from the Atlantic Richfield Company. The common purpose of

---

1. In addition to the issues we address in this opinion, the case also presents the following additional questions to be considered by the court in a later opinion. First, whether plaintiff is correct in claiming that, for purposes of recognizing a tax loss, ECI's stock could not have been considered worthless prior to 1984. Second, whether $1,187,988 paid by Cenex to Atlantic Richfield Company (a creditor) in 1983 may be claimed as a loss in taxable year 1984.

In addition to the above-identified issues, a third issue in the case, since resolved by agree-

ment between the parties, concerned the proper characterization of losses—whether ordinary or capital—claimed by plaintiff for the taxable year 1984 with respect to payments made to creditors of ECI (*i.e.*, $1,187,988 paid to Atlantic Richfield Company and $9,654,230 paid to Continental Illinois Bank). As evident from the parties' briefs and as further acknowledged during the oral argument of this case, these payments are properly regarded as capital losses.

these two transactions was to provide the participating cooperatives with an assured supply of petroleum products for their retail patrons and thus to avoid economic disruptions of the sort that had occurred during the oil-import shortages experienced in the early 1970's.

ECI never gained a sound financial footing. From the beginning, there were problems: ECI refinery was old and in need of modernization; the refinery's product mix was not commercially advantageous (because of a limited capacity to produce unleaded fuels) and its product prices were not competitive; operations were handicapped by the steep increase of OPEC oil prices in the late 1970's and the lack of an assured long-term supply of crude oil; and working capital deficits frequently translated into operating losses that placed a continuous demand for capital contributions upon the member-owners (the organizing cooperatives). Because of these factors, ECI was locked in a downward financial spiral that resulted eventually in the filing of a voluntary petition in bankruptcy, under Chapter 11 of the Bankruptcy Code, on May 15, 1981—some five years after operations were first begun.

Efforts were undertaken to secure a buyer for the refinery but these were not successful. Consequently, in 1984, ECI abandoned its efforts to reorganize and decided, instead, to pursue liquidation under Chapter 7 of the Bankruptcy Code. In its tax return for the year 1984, Cenex claimed an ordinary loss of $14,745,301 associated with its investment as a member-owner in ECI Defendant contends that the loss must be treated as a capital loss.[2]

### The Statutory Framework

The classification of plaintiff's loss as ordinary or capital is crucial to the resulting tax liability, for while a loss from "sales or ex-changes of capital assets shall be allowed only to the extent of gains from such sales or exchanges," I.R.C. § 1211(a),[3] an ordinary loss is not subject to this limitation. In addition, the gain generated from the sale or exchange of a capital asset is generally taxed at a rate lower than the rate applicable to the gain derived from the sale or exchange of an "ordinary" asset. *Compare* I.R.C. § 1201(a)(2) (West 1982), *with* § 11(b). Consequently, setting off the loss against capital gains results in less tax savings than if the amount were set off against a taxpayer's ordinary tax liability. In light of the financial ramifications of the determination to be made, it is not surprising that defendant characterizes the ECI stock as a capital asset, while plaintiff argues that the stock should be classified as inventory, subject to ordinary treatment.

Section 1221 of the I.R.C. broadly defines "capital asset" as "property held by the taxpayer (whether or not connected with his trade or business)," but exempts five categories of property from the definition. The exempted categories include:

(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

(2) property, used in his trade or business, of a character which is subject to the allowance for depreciation ... or real property used in his trade or business;

(3) a copyright, a literary, musical, or artistic composition, a letter or memorandum, or similar property ...;

(4) accounts or notes receivable acquired in the ordinary course of trade or business

---

**2.** Although Cenex's tax return shows 1984 as the year in which its investment in ECI became worthless, for financial accounting purposes Cenex had reported the same loss three years earlier—in 1981. Cenex would explain this seeming discrepancy in loss treatment by contending that different standards guide each determination. Defendant disagrees. Its position is essentially that the same business judgment which correctly dictated the write-off of the ECI investment in 1981 also controls the year of loss determination for tax purposes. As noted earlier, *see* note 1, *supra*, the court expects to address this issue in a later opinion.

**3.** Although the tax law in place in 1984 applies to the court's inquiry, there has been no intervening change in the substance of § 1211(a). Where relevant provisions are identical, citations will be made to the current I.R.C.

for services rendered in the sale of property described in paragraph (1);

(5) a publication of the United States government. . . .

*Id.*

The issue before the court is whether the ECI stock comes within the first exception, which excludes a taxpayer's "inventory" from the I.R.C.'s definition of capital assets. Regardless of the common-sense notions of "inventory" that § 1221's first exception might bring to mind, the court's determination cannot rest solely on facial interpretations of the statute's provisions. Because this court is not the first to which this question has been posed, the inquiry initially must be framed within the context of existing case law—a context in which the substantive terms of the statute itself have played a consistently secondary role.

### Corn Products and Its Progeny

The Supreme Court began to shape the contours of the "capital asset" category under § 1221 in *Corn Products Refining Co. v. Commissioner*, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955). In that case, the plaintiff, a manufacturer of corn products with limited storage capacity, was forced to absorb sharp increases in the market price of corn caused by drought-induced supply shortages. To protect itself against future price surges, it began purchasing corn futures—contracts to buy a fixed amount of corn at a future date for a fixed price. If no shortages appeared, it would take delivery only under those contracts needed for the manufacturing process, and sell the rest on the futures market. However, if shortages did appear, it would accept delivery under the contracts, thereby taking advantage of the previously secured favorable prices. *See id.* at 48–49, 76 S.Ct. at 22–23.

The plaintiff in *Corn Products* contended that the gains and losses from the sale of the futures contracts should have been treated as arising from the sale of capital assets. It contended that its futures trading was separate and apart from its manufacturing process. *See id.* at 49, 76 S.Ct. at 22–23. The Court disagreed, finding that "the transactions were vitally important to the company's business as a form of insurance against in-

creases in the price of raw corn," and concluding that "it is difficult to imagine a program more closely geared to a company's manufacturing enterprise or more important to its successful operation." *Id.* at 50, 76 S.Ct. at 23.

More notable than the substance of these factual premises were the resulting legal conclusions reached by the Court. As "hedging" transactions designed to protect the plaintiff from market fluctuations, the Court ruled that the purchase and sale of corn futures contracts were not to be afforded capital-asset treatment under § 1221. Accordingly, such gains and losses were subject to ordinary treatment under the I.R.C. This ruling was based not on the language of the statutory provision, but on the congressional purpose behind § 1221, as discerned by the Court:

Admittedly, petitioner's corn futures do not come within the literal language of the exclusions set out in that section. They were not stock in trade, actual inventory, property held for sale to customers or depreciable property used in a trade or business. But the capital-asset provision of [§ 117, the predecessor of § 1221] must not be so broadly applied as to defeat rather than further the purpose of Congress. . . . Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss. The preferential treatment provided by § 117 applies to transactions in property which are not the normal source of business income.

*Id.* at 51–52, 76 S.Ct. at 24 (citation omitted). And in language that would come to serve as a springboard for future courts grappling with the applicability of § 1221, the Court concluded that, since the section "is an exception from the normal tax requirements of the Internal Revenue Code, the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly." *Id.* at 52, 76 S.Ct. at 24.

The somewhat nebulous holding of *Corn Products* was given a strikingly expanded scope in future cases, as reflected by the

Court of Claims in *Booth Newspapers, Inc. v. United States*, 157 Ct.Cl. 886, 303 F.2d 916 (1962). In that case, the plaintiffs were newspaper publishers faced with acute shortages of newsprint from their suppliers. As a remedy, they jointly purchased a small paper mill to provide a supplemental newsprint supply that would offset the recurrent shortages. The publishers intended to sell the paper mill once an adequate newsprint supply could be assured by their regular suppliers, and did so after a number of years of ownership. *See id.*, 303 F.2d at 918. Both publishers deducted the losses incurred as a result of the sale of their paper mill stock from their gross incomes for the taxable year in question, but the deductions were disallowed by the IRS, which reasoned that the stock was a capital asset.

The *Booth Newspapers* court identified the crucial issue as determining whether the stock in the paper mill "constituted a capital asset in the hands of these plaintiffs." *Id.* at 920. Applying § 1221's "property held by a taxpayer" definition of capital assets, the court acknowledged that, "[a]s a general proposition, of course, capital stock does constitute 'property' and, aside from stock sold by dealers in the usual course of their business, does not fall within any of the express exclusions" of the section. *Id.* However, the court went on to note that "the term 'property' as used in section 1221 is an elastic concept and not all-inclusive." *Id.*

Reviewing the reasoning of *Corn Products* and its progeny, the court formulated the applicable rule as follows:

> [I]f securities are purchased by a taxpayer as an integral and necessary act in the conduct of his business, and continue to be so held until the time of their sale, any loss incurred as a result thereof may be fully deducted from gross income as a business expense or ordinary loss. If, on the other hand, an investment purpose be found to have motivated the purchase or holding of the securities, any loss realized upon their ultimate disposition must be treated in accord with the capital asset provisions of the Code.

*Id.*, 303 F.2d at 921.

Because the factual record "amply demonstrates ... the business motivation of these plaintiffs at the time they undertook to acquire the [paper mill] stock," *id.*, the court held that the stock "was not a capital asset in the hands of these plaintiffs." *Id.* at 922. Plaintiffs were thus entitled to deduct their stock losses from their gross incomes as ordinary losses. *See id.*

The rule emerging from *Booth Newspapers* thus focused simply on whether an asset was acquired for investment purposes or for business purposes. This subjective, intent-based approach governed the inquiry regarding the classification of an asset as "capital" or "ordinary" in a long line of subsequent cases. *See, e.g., Waterman, Largen & Co., Inc. v. United States*, 189 Ct.Cl. 364, 419 F.2d 845, 847 (1969) (applying the "governing principles" of *Booth Newspapers* ). Where a taxpayer had acquired stock in another company in order to secure a source of supply, as in *Booth Newspapers*, courts generally ruled that the transaction gave rise to ordinary gains and losses. For example, in *FS Services, Inc. v. United States*, 188 Ct.Cl. 874, 413 F.2d 548 (1969), under circumstances similar to the present case, a petroleum wholesaler had purchased an interest in a refinery in an effort to counteract supply problems. The court found that the stock "was acquired by taxpayer as an integral and necessary act in the conduct of its business and continued to be so held until its disposition," and thus that the taxpayer was entitled to deduct losses from the stock's sale as ordinary losses. *Id.*, 413 F.2d at 555. *See also Campbell Taggart, Inc. v. United States*, 744 F.2d 442, 450 (5th Cir.1984) (ruling that *Corn Products* doctrine can apply to a holding company's acquisition of securities).

Where a taxpayer's acquisition of an asset reflected both investment and business purposes, courts developed a "mixed-motive" approach under which "ordinary" treatment would be afforded to an asset only if there was no substantial investment intent behind its acquisition. "[S]tock purchased with a substantial investment purpose is a capital asset even if there is a more substantial business motive for the purchase." *W.W. Windle Co. v. Commissioner*, 65 T.C. 694, 712, 1976 WL 3741 (1976). Thus, the focus of

the inquiry remained solely on the motives underlying the taxpayer's acquisition of an asset. And the inquiry itself still was viewed as a direct off-shoot of the Supreme Court's reasoning in *Corn Products. See Agway, Inc. v. United States,* 207 Ct.Cl. 682, 524 F.2d 1194, 1201 (1975) ("The rule can be stated to be ... that *Corn Products* will be applied in this court to purchases of company stock to obtain a source of supply, only if there is no substantial investment intent.").

### *Arkansas Best: Corn Products* Revisited

The restrictive interpretation of § 1221's "capital asset" definition, on which the "source of supply" line of cases was founded, continued to enjoy wide acceptance by courts and commentators until the *Corn Products* holding was revisited by the Supreme Court in *Arkansas Best Corp. v. Commissioner,* 485 U.S. 212, 108 S.Ct. 971, 99 L.Ed.2d 183 (1988). In *Arkansas Best,* the plaintiff was a diversified holding company that, based on its need for additional capital, had acquired stock in a bank in 1968. The bank purchased additional shares between 1969 and 1974 before selling the bulk of its stock in 1975. The record showed that the bank had been healthy until 1972, after which time federal examiners classified it as a "problem bank." The Tax Court ruled that the stock purchased by plaintiff before 1972 was a capital asset because it had been acquired with a substantial investment purpose. The stock purchased after that time, however, was subject to ordinary-loss treatment because it had been acquired exclusively for the business purpose of protecting the plaintiff's reputation by infusing the bank with enough capital to avoid failure. *See Arkansas Best v. C.I.R.,* 83 T.C. 640, 654–57, 1984 WL 15624 (1984).

The Court of Appeals reversed the Tax Court, concluding that the bank stock "was a capital asset because it does not fall into one of the statutory exceptions." *Arkansas Best v. C.I.R.,* 800 F.2d 215, 218 (8th Cir.1986). As such, "Arkansas Best's losses upon disposition of the Bank stock are not entitled to ordinary loss treatment, regardless of when or why the stock was acquired." *Id.* at 220.

Before the Supreme Court, the plaintiff argued that § 1221's definition of "capital asset" as "property held by the taxpayer (whether or not connected with his trade or business)" does not include property acquired for a business purpose. *Arkansas Best,* 485 U.S. at 217, 108 S.Ct. at 974–75. The Court began its analysis with the acknowledgment that the motive-based approach to defining a capital asset under § 1221 "finds much support in the academic literature and in the courts." *Id.* at 216, 108 S.Ct. at 974 (footnotes omitted). However, the Court added, "this broad reading finds no support in the language of § 1221." *Id.*

The Court found no basis for making an asset's status as "property" within the meaning of § 1221 turn on the motive behind its acquisition. In fact, the Court reasoned, such a motive test "is not only nowhere mentioned in § 1221, but it is also in direct conflict with the parenthetical phrase 'whether or not connected with his trade or business.'" *Id.* at 217, 108 S.Ct. at 974. The statute's broad definition of capital asset "explicitly makes irrelevant any consideration of the property's connection with the taxpayer's business, whereas [the motive test] would make this factor dispositive." *Id.*[4]

Most relevant to our inquiry is the final step of the Court's rejection of the plaintiff's position in *Arkansas Best.* "In the end," the Court observed, the plaintiff "places all reliance on its reading of *Corn Products* ... a reading we believe is too expansive." *Id.* at 219, 108 S.Ct. at 975. After reviewing the outcome of that case, the Court acknowledged that the *Corn Products* Court "did not state explicitly whether the holding was based on a narrow reading of the phrase 'property held by the taxpayer,' or on a broad reading of the inventory exclusion of § 1221." *Id.* at 220, 108 S.Ct. at 976. "In light of the stark language of § 1221," however, the *Arkansas Best* Court went on to

---

4. The Court also rejected the plaintiff's related contention that the five exceptions listed in § 1221 are merely illustrative, rather than exhaustive, "and that courts are therefore free to fashion additional exceptions in order to further the general purposes of the capital-asset provisions." *Arkansas Best,* 485 U.S. at 217, 108 S.Ct. at 975. The "language of the statute," the Court observed, "refutes [this] construction." *Id.*

hold that *Corn Products* "is properly interpreted as involving an application of § 1221's inventory exception." *Id.*

Under the factual circumstances of *Corn Products*, in which the plaintiff "bought, sold, and took delivery under the futures contracts as required by the company's manufacturing needs," the Court observed that the futures "can 'easily be viewed as surrogates for the raw material itself.'" *Id.* (quoting Boris I. Bittker, *Federal Taxation of Income, Estates and Gifts* ¶ 51.10.3, at 51–62 (1981)). The *Arkansas Best* Court concluded:

> [A]lthough the corn futures were not 'actual inventory,' their use as an integral part of the taxpayer's inventory-purchase system led the Court to treat them as substitutes for·the corn inventory such that they came within a broad reading of 'property of a kind which would properly be included in the inventory of the taxpayer' in § 1221.

*Id.* at 221, 108 S.Ct. at 977.

The Court thereby rejected the notion that "the Court in *Corn Products* intended to create a general exemption from capital-asset status for assets acquired for business purposes." *Id.* The close connection between the taxpayer's futures transactions and its business operation in *Corn Products* "was crucial to whether the corn futures could be considered surrogates for the stored inventory of raw corn." However, this "business connection" was relevant only "in determining the applicability of certain of the statutory exceptions, including the inventory exception." *Id.* In the end, the Court concluded that *Corn Products* "is properly interpreted as standing for the narrow proposition that hedging transactions that are an integral part of a business' inventory-purchase system fall within the inventory exclusion of § 1221." *Id.* at 222, 108 S.Ct. at 977. The case's holding was thus inapplicable to plaintiff, "which is not a dealer in securities," and "has never suggested that the Bank stock falls within the inventory exclusion." *Id.* The Court held that the loss arising from the sale of the stock was a capital loss. *See id.* at 223, 108 S.Ct. at 977–78.

Defendant argues that the Supreme Court's decision in *Arkansas Best* "made clear that all stock is a 'capital asset' within the meaning of § 1221, unless it is held by a securities dealer for sale to customers." The "source of supply" line of cases would thereby no longer be applicable to the purchase and sale of stock. According to defendant, unless plaintiff were a dealer of stock, its interest in the oil refinery would be subject to capital-asset treatment. Plaintiff disagrees, pointing out that the *Arkansas Best* Court was addressing the general applicability of § 1221, not that of the inventory exception. Plaintiff does assert, however, that the decision in *Arkansas Best* implicitly "reaffirmed" the "source of supply" line of cases by holding that the inventory exception should be interpreted broadly.

While the *Arkansas Best* Court did not explicitly define the scope of the inventory exception under § 1221, its approach to the specific problem before it does shed light on the present viability of plaintiff's "source of supply" argument. Through its circumscription of the *Corn Products* holding, the Court did away with the bulk of the legal assumptions on which the "source of supply" analysis was built. The Court made clear that the motive behind a taxpayer's acquisition of an asset cannot serve as the touchstone of the inquiry concerning its status as capital or ordinary. And contrary to the implications of plaintiffs argument, the Court did not reject the "motive test" as the proper mode of analysis concerning the general applicability of § 1221, only to then embrace it as the all-encompassing determinant of inventory exceptions. Rather, the Court recognized *Corn Futures* as a situation in which the asset in question—corn futures contracts—could be viewed as a surrogate for the actual inventory. The relevance of the "business connection" discussed in *Arkansas Best* arises when courts are faced with assets that are potentially viewable as surrogates for inventory. At that point, courts must draw a distinction between assets that are an "integral part" of a business' inventory-purchase system, and those that are not. *Id.* at 222, 108 S.Ct. at 977. The Court's invocation of a "business connection" is not a *mantra* by which all assets connected to the operation of a taxpayer's business may gain the status of "inventory."

The implicit underpinnings of the Supreme Court's *Arkansas Best* holding were made explicit in the underlying Court of Appeals opinion, which unmistakably rejected the "source of supply" line of cases emerging from *Corn Products*. *See Arkansas Best v. Commissioner*, 800 F.2d 215 (8th Cir.1986), *aff'd*, 485 U.S. 212, 108 S.Ct. 971, 99 L.Ed.2d 183 (1988). The Court of Appeals acknowledged that "some federal courts have taken the position that capital stock is not a capital asset when acquired to assure a supply of raw materials vital to the taxpayer's business," and have applied either a "business purpose-investment purpose test" or a "substantial investment purpose test" to make this determination. "With all due respect to these courts," the Court of Appeals continued, "it is clear to us that both tests lack a basis in the statutory language, and we reject them." *Id.* at 220. The court's opinion— affirmed by the Supreme Court—disposed of the plaintiff's interpretation of § 1221 as follows:

> We do not read *Corn Products* as either requiring or permitting the courts to decide that capital stock can be anything other than a capital asset under section 1221. It seems to us that one of the last places where the legal system deliberately should foster subjectivity and uncertainty is in the tax code. *Corn Products* and its progeny, which we respectfully view as misbegotten, have done precisely that, leading to increased recourse to the administrative and judicial processes to resolve conflicting contentions about taxpayers' motivations in purchasing capital stock. Congress could have written section 1221 to incorporate some sort of exception regarding capital stock, just as it recognized the unique position of securities dealers in 26 U.S.C. § 1236, but it did not do so. We believe that the judiciary lacks authority to create exceptions to section 1221 that Congress did not choose to make.

*Id.* at 221.

Even before *Arkansas Best*, the expanded application of the *Corn Products* doctrine to situations in which a taxpayer has purchased stock in another company troubled some observers. *See, e.g., Agway, Inc. v. United States*, 207 Ct.Cl. 682, 524 F.2d 1194, 1200 (1975) ("*Corn Products* has been applied in lower courts in a variety of situations which possibly surprise the *Corn Products* court...."). The incongruity between commodity futures—which the *Corn Products* Court viewed as substitutes for actual inventory—and the capital stock of a corporation always has been apparent. Even those courts that endorsed the "source of supply" approach recognized that "[a]s we move from inventory-related corn futures to a more traditional form of capital asset, such as stock, we should be more reluctant to be innovative in further broadening the domain of subjective analysis and unpredictability." *W.W. Windle Co. v. C.I.R.*, 65 T.C. 694, 713, 1976 WL 3741 (1976) (acknowledging that "there must be limits to the liberties we can take with the statutory language of section 1221" because "[w]ords are not infinitely elastic").

### Discussion

In the wake of *Arkansas Best*, the incongruity between corn futures and capital stock is even more glaring. Because the *Arkansas Best* Court foreclosed the existence of a judicially crafted, extra-statutory exception to § 1221's definition of capital asset, the only means by which a court can grant ordinary treatment to capital stock is to hold that ownership of another corporation is functionally equivalent to ownership of inventory. Because of the nature and breadth of investment entailed by ownership of corporate stock—above and beyond that entailed by ownership of inventory—this court cannot hold that the two assets are equivalent for purposes of § 1221.

Plaintiff might indeed have been motivated to acquire stock in an oil refinery by its desire to secure a source of inventory. But through that stock purchase, plaintiff did more than secure a supply of petroleum; plaintiff became the owner of a refining company. It is as if the plaintiff in *Corn Products*, in order to secure a dependable source of corn, had bought a brokerage house that issued corn futures contracts. The Supreme Court would have been hard-pressed to find that shares in the brokerage house were "property of a kind which would properly be included in the inventory of the taxpayer,"

§ 1221(1)—*i.e.,* "surrogates for the raw material itself." *Arkansas Best,* 485 U.S. at 220, 108 S.Ct. at 976 (quoting Bittker, *supra*). In this case, the fact that the intended function of the stock purchase was the securing of a source of petroleum does not negate the myriad collateral functions inherent to the ownership of a corporation, whether sought by the taxpayer or not.

█ Unless the taxpayer in question is a dealer in securities, an ownership interest in a corporation cannot fit within even a strained interpretation of the term "inventory." Although other courts "have manipulated the *Corn Products* decision to allow the *Corn Products* doctrine to apply to factual situations outside the commodity hedging transactions for which the exception was created," Virginia L. Briggs & H. Ward Classen, *Arkansas Best: A Return to the Reasoning of Corn Products,* 44 Wash. & Lee L.Rev. 1229, 1251 (1987), this court declines to follow their lead.[5] The court holds that plaintiff's loss on its investment in the ECI stock is properly subject to capital-asset treatment under § 1221.

### The Northern Tier Shut-down Costs

#### *The Factual Background*

Plaintiff owned shares, along with seven other oil companies, of Northern Tier Pipeline Company, which was established to construct and operate a pipeline from the State of Washington to Minnesota.[6] In 1983, the pipeline project was abandoned and Northern Tier ceased its business activities after its board of directors decided not to pursue an application for a needed environmental permit with the State of Washington. Pursuant to a June 1982 agreement, plaintiff subsequently made payments to Northern Tier in response to "cash calls" for costs stemming from the shutdown of the operation. Plaintiff made two such payments in 1983, totaling $75,465, and two more payments in 1984, totaling $184,762.

On its 1983 tax return, plaintiff claimed the loss from the 1983 shutdown payments to Northern Tier as a nonpatronage bad debt deduction. On its original 1984 tax return, plaintiff claimed the loss from the 1984 shutdown payments as a short-term capital loss. In an audit of plaintiff's 1983 tax return, the IRS disputed whether plaintiff's deduction for the 1983 payments should be patronage or nonpatronage, but, according to plaintiff, accepted the position that the loss qualified as a bad debt deduction. Based on this audit determination, plaintiff amended its 1984 tax return to claim the loss from the 1984 shutdown payments as a bad debt deduction. Subsequently, in auditing plaintiff's 1984 return, the IRS ruled that the shutdown payments were not loans, and thus could not serve as the basis for a "bad debt deduction." The IRS determined, rather, that the payments gave rise to a short-term capital loss— a determination challenged here by plaintiff.

#### *The Legal Framework*

Under § 166(a)(1) of the I.R.C., a taxpayer is allowed to fully deduct "any debt which becomes worthless within the taxable year." To qualify under § 166, there must exist a "bona fide debt" which "arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." Treas. Reg. § 1.166–1(c). Importantly, "[a] gift or contribution to capital shall not be considered a debt for purposes of section 166." *Id.*

█ In determining whether a payment is a loan or a contribution to capital, "the taxpayer's motive is not the crucial factor." *Gilbert v. Commissioner,* 248 F.2d 399, 404 (2d Cir.1957). Courts have applied a variety

---

**5.** The court recognizes that its rejection of the "source of supply" principle, as applied to capital stock, runs counter to the holding of *Circle K Corp. v. United States,* 23 Cl.Ct. 665, 672 (1991). The court in *Circle K,* noting that "nowhere did [the *Arkansas Best* ] opinion specifically reject the 'source of supply' principle," held that "a source of supply stock purchase may qualify as a hedging transaction if it is an integral part of plaintiff's inventory-purchase system." *Id.* While courts should strive for consistency in their rul-

ings, for the reasons stated above this court cannot accept the rationale set forth in *Circle K.*

**6.** From December 1979 through November 1982, plaintiff purchased $3,662,585 worth of common stock of Northern Tier. From December 1981 through September 1983, plaintiff made loans to Northern Tier in the amount of $524,783, including accrued interest.

of criteria in making these determinations, but the focus is always on the particular circumstances of the transaction in question. *See Plantation Patterns, Inc. v. Commissioner,* 462 F.2d 712, 719 (5th Cir.1972) ("[E]ach case must be decided on its own facts, and no one standard is controlling."). The "classic debt" is an "unqualified obligation to pay a sum certain at a reasonably fixed maturity date along with a fixed percentage in interest payable regardless of the debtor's income or lack thereof." *Gilbert,* 248 F.2d at 402. And "[w]hile some variation from this formula is not fatal to the taxpayer's effort to have the advance treated as a debt for tax purposes ... too great a variation will of course preclude such treatment." *Id.* at 402–03 (citations omitted).

### Discussion

■ Plaintiff's characterization of the shutdown payments as loans is based on its reading of the June 1982 Credit Agreement under which they were made. That Agreement, according to plaintiff, "was a valid enforceable obligation to pay a fixed amount of money, provided for an interest rate, and was subject to acceleration in the event Northern Tier either commenced or abandoned the pipeline project." As such, plaintiff insists, the "traditional indicia of 'debt' envisioned by I.R.C. § 166(a)(1) and Treasury Regulation § 1.166–1(c) were evidenced" by the Agreement.

Plaintiff reads the 1982 Credit Agreement as having surrounded the shutdown payments with the terms and conditions of traditional loans, when in fact the Agreement did nothing of the sort. The Agreement was entered into by Northern Tier and the eight shareholders of Northern Tier, to become effective on June 4, 1982. The primary purpose of the Agreement was to amend Northern Tier's "Credit Agreements," which were defined in the Agreement as "Credit and/or Loan Agreements" concluded "previously" between Northern Tier and its shareholders. The amounts loaned from the shareholders to Northern Tier pursuant to those agreements were "evidenced by notes of Northern Tier." The Agreement proceeded to amend the "Credit Agreements, any amendments there-

to and each of the Notes" to provide, in part, that:

> Interest shall be compounded semi-annually on the first days of January and July each year at the rates set forth for each individual note. Such interest, as so compounded, and all principal amounts shall be payable by Northern Tier on the earlier of the date Northern Tier commences construction of the Pipeline Project or the Pipeline Project is terminated whereupon all such amounts will become immediately due and payable.

The Agreement also provided that the parties agreed "to note conspicuously on each of the Notes that said Notes have been amended by this agreement and to attach a copy of this agreement thereto."

Only two paragraphs of the Agreement addressed shutdown costs. The first paragraph provided that, "[i]n the event all of the activities on the Pipeline Project are terminated," seven of the shareholders, including Cenex, agree to pay their "pro rata share of the initial $750,000 of shutdown costs." This pro rata share was to be based on a party's percentage ownership of Northern Tier's outstanding stock as of June 3, 1982. The second paragraph provided that five of the shareholders, including Cenex, agreed to pay pro rata shares of any shutdown costs in excess of $750,000. In the paragraphs addressing shutdown costs, there was no mention of interest, a repayment date, or even a repayment obligation in general. And Northern Tier's subsequent requests to the shareholders for cash at the various times the shutdown costs arose—i.e. the "cash calls"—referenced only the June 1982 Agreement; the requests themselves did not contain any new terms or conditions under which the payments were to be made.

Under the terms of the 1982 Agreement, the only indications that shareholders' payments would give rise to enforceable obligations, or that interest would accrue, were made in reference to already existing loans from the shareholders to Northern Tier. The Agreement specifically amended loan and credit agreements "previously" entered into. In addition, the Agreement required the included amendments to be attached to the

Notes themselves—a requirement that appears to presume the Notes' current existence. No mention was made of future loans, credit agreements, or notes, and no indication was given that the amendments would apply prospectively in the event that future loans were made.

An even clearer indication of the Agreement's function comes from its structure. The language regarding interest and repayment acceleration is found in a self-contained section addressing the existing loans and credit agreements. The provisions governing the allocation of shutdown costs among the shareholders are found in separately numbered paragraphs, and no intended overlap between the sections is even remotely discernible. Furthermore, if plaintiff's interpretation were to be adopted, and the provisions governing the existing loans were applied as well to the future shutdown costs, the substance of the terms would make little sense. The Agreement provided that the loaned amounts would become payable by Northern Tier if the pipeline project were terminated. Under plaintiff's reading, this means that the amounts for shutdown costs loaned from the shareholders to Northern Tier would become payable upon the project's termination. However, shutdown costs do not even begin to arise until a project is, in fact, terminated, so shareholders could hardly demand repayment before they have even been asked to pay the amounts in the first place.

Terms regarding interest accrual also would have no meaning. The Agreement provides that interest would be compounded semi-annually "at the rates set forth for each individual note." No interest rates were included in Northern Tier's subsequent "cash calls." Even if the Agreement could be applied in its entirety, interest payments could not be read into any of the shutdown cost payments.

In setting forth the allocation of shutdown costs among Northern Tier's shareholders, the parties to the 1982 Agreement were not undertaking a new series of loans to their troubled company. Rather, they were merely recognizing their responsibilities as shareholders in the event that Northern Tier failed completely. The shareholders could not reasonably expect Northern Tier to repay the shutdown costs, plus interest, when those costs would only be incurred after the company ceased business operations. This common-sense notion is confirmed by the 1982 Agreement upon which plaintiff relies. There is nothing expressed in the language of the Agreement or by logical implication thereunder to lead one to believe that plaintiff's payments of shutdown costs were loans, and not capital contributions, to Northern Tier. The court thus holds that the amounts advanced to Northern Tier by plaintiff in taxable year 1984 were properly classifiable as short-term capital losses.[7]

### Conclusion

The court holds that the loss plaintiff suffered as a result of its investment in ECI must be treated as a capital loss. Further, the court holds that the amounts advanced by plaintiff to Northern Tier to cover shutdown costs are also properly classified as capital in nature. The entry of judgment is to be deferred pending the parties attempts to resolve the two remaining issues in this case.

---

7. Because "[c]ontract interpretation is a matter of law and thus is amenable to decision on summary judgment," *Government Systems Advisors,* *Inc. v. United States,* 847 F.2d 811, 813 n. 1 (Fed.Cir.1988), this issue may be resolved on the basis of the parties' motions and oral argument.